# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

Jenna Johnson, on behalf of herself
and all others similarly situated,

Plaintiffs,

vs.

Beech-Nut Nutrition Company,              Civil Action No.
Campbell Soup Company (Plum Organics),
Gerber Products Company,
Hain Celestial Group (Earth's Best Organics),
Nurture, Inc. (d/b/a HappyFamily Organics),
North Castle Partners (d/b/a Sprout Foods, Inc.),
Walmart, Inc. (Parent's Choice)

Defendants.

---

## CLASS ACTION COMPLAINT

---

## <u>TABLE OF CONTENTS</u>

**I. INTRODUCTION** ............................................................... 3

**II. PARTIES** ...................................................................... 7

**III. JURISDICTION** ........................................................... 26

**IV. BABY FOOD SALES MEAN BIG BUCKS FOR DEFENDANTS** .......................... 26

**V. RAMPANT CRIMINAL ACTIVITY: THE NATION'S TOP BABY FOOD MANUFACTURERS ENGAGE IN WIDESPREAD FRAUD** ......................................... 63

**VI. DEFENDANTS HAVE BEEN AWARE OF HIGH HEAVY METAL CONTAMINATION IN THEIR PRODUCTS BUT HAVE FAILED TO TAKE ACTION** .......................................................... 69

**VII. USING BIG TOBACCO'S PLAYBOOK, DEFENDANTS RUSH TO CREATE THE BABY FOOD COUNCIL AND EACH USES IT AS A VESSEL FOR FRAUD** ......................................................... 72

**VIII. CONGRESS DROPS A BOMBSHELL: THE REPORT** ...................................... 79

**IX. CLASS ACTION ALLEGATIONS** ................................................ 90

**X. CLAIMS** ...................................................................... 94

**XI. DEMAND FOR JURY TRIAL** ................................................... 127

**XII. PRAYER FOR RELIEF** ...................................................... 127

**APPENDIX OF EXHIBITS** ....................................................... 129

## I.   INTRODUCTION

1.     The crime of food fraud, as it is known, is widely recognized as a major problem that siphons millions of dollars from unsuspecting consumers.[1]

2.     In 1906, Upton Sinclair published a novel, <u>The Jungle</u>, to expose the horrors that were occurring in the American meat-packing industry, including the sickness and death of children caused by food fraud and contamination during manufacturing and processing.

3.     Unfortunately, more than a century later, food fraud remains a major problem. In particular, baby food contamination during the manufacturing and production is a major issue that is concealed and misrepresented to the purchasers of baby food products.

4.     America remains mired in coordinated, criminal corporate behavior that puts the health and safety of America's infants and toddlers at severe risk and defrauds their parents out of money paid for premium products.

5.     The greed of executives at baby food companies has caused them to engage long-running, ongoing schemes to defraud involving premium baby food. Several companies have promised and reassured parents that their baby food products are pure, natural, safe, and healthy; in reality, these products contain heavy metals that are not pure, unnatural, unsafe, and pose a major risk to babies and infants.

---

[1] *See, e.g.*, Arun Chauhan, *Food Fraud—an evolving crime with profit at heart*, NEW FOOD, Apr. 23, 2020 ("Food fraud refers to the deliberate and intentional substitution, addition, tampering with, or misrepresentation of food, ingredients or packaging at some stage of a product's distribution or production cycle. It also refers to false or misleading statements made about a food or drink product for economic gain."); Gary C. Smith, *What Is Food Fraud?*, FOOD SAFETY NET SERVICES, Dec. 13, 2016 ("Food fraud is the act of purposely altering, misrepresenting, mislabeling, substituting or tampering with any food product at any point along the farm–to–table food supply–chain. Fraud can occur in the raw material, in an ingredient, in the final product or in the food's packaging.").

6.     Had parents (or guardians)[2] been fully informed about the contents of what they were purchasing, they would not have made these purchases of premium baby food—or would have paid far less for less-than-premium contents.

7.     The food fraud has occurred in multiple stages. Executives not only devised a scheme to cut corners and not make the food they produce and manufacture safe for consumption, but they also engaged in additional fraudulent acts to cover-up and conceal their food fraud crimes once they were exposed.

8.     The mail and wire fraud statutes have a long-established meaning: each mailing and each use of the wires *in furtherance of* a scheme to defraud is a separate criminal act. In turn, given the scope of the advertising and marketing and use of the Internet and email, each Defendant has engaged in a pattern of wire and mail fraud since at least January 2019, when Defendants formed and began using the Baby Food Council as a vessel for fraud.

9.     This ongoing fraud was only recently revealed. On February 4, 2021, the U.S. House of Representatives Committee on Oversight and Reform dropped the explosive report, "*Baby Foods Are Tainted with Dangerous Levels of Arsenic, Lead, Cadmium, and Mercury*" (hereinafter "the Report"), exposing rampant fraud, misrepresentations, half-truths, and fraud by omission committed by the nation's seven (7) leading baby food manufacturers in selling food to the most vulnerable in our population: infants and toddlers.[3]

---

[2] This Complaint uses the term "parents" at times instead of "guardians"; any purchaser of baby food within the scope of the class definition is a class member.

[3] Staff Report, Subcommittee on Economic and Consumer Policy of the Committee on Oversight and Reform, U.S. House of Representatives, *Baby Foods Are Tainted with Dangerous Levels of Arsenic, Lead, Cadmium, and Mercury* (February 4, 2021) https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2021-02-04%20ECP%20Baby%20Food%20Staff%20Report.pdf (last visited February 19, 2021) *See* Exh. A.

10.     The Report highlighted the high levels of toxic heavy metals present in numerous baby foods produced by Defendants, namely the four Defendants (Beech-Nut, Gerber, Hain, and Nurture) who cooperated with Congress's investigation.

11.     The three others (Campbell, Sprout Organic and Walmart) refused cooperation,[4] suggesting their misconduct was even more nefarious (particularly because it is unusual for corporations not to cooperate with federal regulators).

12.     Although no federal regulations yet exist vis-à-vis most baby foods, the FDA sets the maximum allowable levels of these toxic heavy metals in water bottles safe for consumption at 10 ppb inorganic arsenic, 5 ppb lead and 5 ppb cadmium.[5]

13.     The baby food at issue, examined in the Report, showed levels as high as **91 times** as much arsenic, **177 times** as much lead, **69 times** as much cadmium, and **5 times** as much mercury than that allowed in bottled water.[6]



14.

*represents highest levels of PPB found in single ingredients

---

[4] *Id.*  at 2.

[5] *Id.*  at 4.

[6] *Id.*

15.     These levels are actually far greater because a bottle of water is measured using an adult consumption standard—not that of an infant or toddler.

16.     All of these toxins are harmful to the babies and children who ingested them. Exposure to these heavy metals can result in:

   a.   Permanent decreases in IQ;

   b.   Diminished future economic productivity;

   c.   Increased risk of future criminal and antisocial behavior in children;

   d.   Affected neurological development and brain function in infants;[7]

   e.   Other unknown and harmful effects to children.

17.     But baby food is big business and these companies feared that millions of dollars of revenue might slip away if they took the precaution, time, and necessary steps to get their products into safe and healthy, consumable baby food. So they cut corners, covered up their scheme, and to this day have not recalled their products or stop their campaign of lies and misrepresentations.

18.     This criminal behavior among several of America's top baby food manufacturers remains ongoing and must be stopped. Fortunately, Congress passed the RICO Act in 1970 to address situations precisely like this—interstate, nationwide fraud that no state can tackle on its own and federal prosecutors and agencies either lack the resources or priorities to stop immediately (that is not to say indictments will not follow, but indictments typically come many years later—not immediately).

---

[7] *Id.* at 2.

19.    The crime of food fraud, as it is known, is widely recognized as a major problem that siphons millions of dollars from unsuspecting consumers.[8]

20.    This case seeks to hold them accountable where government enforcement has not. They should be divested of their gains and repay the consumers they lied to and stole from.

## II.    PARTIES

21.    Plaintiff Jenna Johnson is a resident of the state of Kansas and purchased baby foods for her child produced by Defendants.

    a.    Plaintiff Johnson purchased products from Defendant Beech-Nut, namely Green Beans, Pear & Blueberries and Banana, Orange and Pineapple.

    b.    Plaintiff Johnson purchased products from Defendant Campbell, namely Plum Organics Prunes Pouches, Mango Pouches and Sweet Potato, Apple and Corn Pouches. Plaintiff Johnson purchased products from Defendant Nurture, namely HappyBaby Organic Pears, Green Beans, Organic Carrots, Organic Sweet Potatoes, Organic Apples & Spinach, Pumpkin & Carrots, Oatmeal Baby Cereal.

    c.    Plaintiff Johnson purchased products from Defendant Earth's Best, namely Organic Peas, Organic Pears, Organic Corn & Butternut Squash and Whole Grain Oatmeal Cereal. Defendant Johnson also purchased Gerber Natural Apple and Natural Pear.

---

[8] See, e.g., Arun Chauhan, *Food Fraud—an evolving crime with profit at heart*, NEW FOOD, Apr. 23, 2020,

("Food fraud refers to the deliberate and intentional substitution, addition, tampering with, or misrepresentation of food, ingredients or packaging at some stage of a product's distribution or production cycle. It also refers to false or misleading statements made about a food or drink product for economic gain."); Gary C. Smith, *What Is Food Fraud?*, FOOD SAFETY NET SERVICES, Dec. 13, 2016 ("Food fraud is the act of purposely altering, misrepresenting, mislabeling, substituting or tampering with any food product at any point along the farm–to–table food supply–chain. Fraud can occur in the raw material, in an ingredient, in the final product or in the food's packaging.").

22.     Prior to purchasing these baby foods, Plaintiff Johnson saw Defendants' advertisements, claims on the packaging alleging the food was nutritious, healthy and safe, and she relied on these repetitions in purchasing food for her daughter. During that time, based on Defendants' omissions and the false and misleading claims, warranties, representations, advertisements and other marketing, Plaintiff was unaware that these products contained any level of heavy metals, chemicals or toxins, and would not have purchased the food if that was fully disclosed, or she would not have paid as much for the baby foods if that information was fully disclosed. Plaintiff was injured by paying a premium for the baby foods that have no or very little value—or whose value was at least less than what she paid—based on the presence of the alleged heavy metals, chemicals, and toxins. Plaintiff Johnson has suffered anguish and concern for her daughter since it has been revealed that these products contain high levels of heavy metals.

23.     Plaintiff Abbey Johnston is a resident of the state of Arkansas and purchased baby foods for her child produced by Defendants.

> d.   Plaintiff Johnston purchased products from Defendant Beech-Nut, namely Banana, Butternut Squash, Natural Carrots, Green Beans, Sweet Potatoes, Pumpkin, Apple Cinnamon Granola, Pumpkin Cinnamon, Carrots Sweet Corn Pumpkin, Pear Blueberries, Green Bean Sweet Corn, and Butternut Squash Sweet Corn.

> e.   Plaintiff Johnston purchased products from Defendant Gerber, namely Bananas, Sweet Potato, Apple Strawberry Banana, Apple, Banana Blackberry Blueberry, Pear, Apple Banana Pear, Butternut Squash, Banana Orange Medley, Green Beans, Carrots, Apple Blueberry, Peach, Sweet Potato Turkey, Pear Cinnamon Oatmeal, Pea, Pear Pineapple, Carrot Sweet Potato Pea, Sweet Potato Corn, Prunes, Pear Zucchini Corn, Banana Blueberry, Sweet Potato Mango Kale, Carrot Mango Kale,

Chicken Noodle, Chicken Rice, Hawaiian Delight, Mac and Cheese, Pea Carrot Spinach, Turkey Rice, and Vegetable Beef.

f.   Plaintiff Johnson purchased products from Defendant Walmart, namely Berries & Oats, Strawberry Banana with yogurt and Chicken Noodle.

24.   Prior to purchasing these baby foods, Plaintiff Johnston saw Defendants' advertisements, claims on the packaging alleging the food was nutritious, healthy and safe, and she relied on these repetitions in purchasing food for her daughter. During that time, based on Defendants' omissions and the false and misleading claims, warranties, representations, advertisements and other marketing, Plaintiff was unaware that these products contained any level of heavy metals, chemicals or toxins, and would not have purchased the food if that was fully disclosed, or she would not have paid as much for the baby foods if that information was fully disclosed. Plaintiff was injured by paying a premium for the baby foods that have no or very little value—or whose value was at least less than what she paid—based on the presence of the alleged heavy metals, chemicals, and toxins. Plaintiff Johnston has suffered anguish and concern for her daughter since it has been revealed that these products contain high levels of heavy metals.

25.   Plaintiff Riley Bucci is a resident of the state of Kansas and purchased baby foods for her children produced by Defendants.

g.   Plaintiff Bucci purchased products from Defendant HappyBaby, namely Blueberry and Purple Carrot Organic Teethers, Sweet Potato & Banana Organic Teethers, Clearly Crafted Pears Baby Food, Banana Blueberry & Beets Baby Food, Clearly Crafted Green Beans Baby Meals, Clearly Crafted Apples Quinoa & Beets Baby Food, Clearly Crafted Bananas Raspberries & Oats Baby Food Pouch, Clearly Crafted Apples Blueberries & Oats Baby Meals. Plaintiff Bucci purchased products

from Defendant Beech-Nut, namely Naturals Apple Pumpkin & Cinnamon Baby Food, Naturals Carrots Baby Food, Organics Banana Cinnamon & Granola Baby Food.

h. Plaintiff Bucci purchased products from Defendant Plum Organics, namely Apple & Broccoli Baby Food Pouches, Mighty Protein & Fiber Banana White Bean Strawberry & Chia Baby Food Pouch, Stage 2 Organic Baby Food Fruit and Veggie Variety Pack, 4 oz. pouches. Plaintiff Bucci purchased products from Defendant Gerber, namely Organic Single Grain Rice Baby Cereal.

i. Plaintiff Bucci purchased products from Defendant Earth's Best, namely Organic Banana Raspberry & Brown Rice Baby Food Pouch.

26. Prior to purchasing these baby foods for her son and daughter, Plaintiff Bucci saw Defendants' advertisements, claims on the packaging alleging the food was nutritious, healthy and safe, and she relied on these repetitions in purchasing food for her daughters. During that time, based on Defendants' omissions and the false and misleading claims, warranties, representations, advertisements and other marketing, Plaintiff was unaware that these products contained any level of heavy metals, chemicals, or toxins, and would not have purchased the food if that were fully disclosed, or she would not have paid as much for the baby foods if that information was fully disclosed. Plaintiff was injured by paying a premium for the baby foods that have no or very little value—or whose value was at least less than what she paid—based on the presence of the alleged heavy metals, chemicals, and toxins. Plaintiff Bucci has suffered anguish and concern for her children since it has been revealed that these products contain high levels of heavy metals.

27.    Plaintiff Kelsey Gross is a resident of the state of Kansas and purchased baby foods for her daughter produced by Defendants.

a.    Plaintiff Gross purchased products from Defendant Campbell (Plum Organics), namely Apple, Plum, Berry, and Barley Pouch; Pear, Cherry, Blackberry, Strawberry, Black Bean, Spinach, and Oat Pouch; Pear, Purple Carrot, and Blueberry Pouch; Pear, Spinach, and Pea Pouch; Guava, Pear, and Pumpkin Pouch; Mango, Carrot, and Coconut Cream Pouch; Apple, Butternut Squash, and Granola Pouch; Peach, Pumpkin, Carrot, and Cinnamon Pouch; Apple, Blackberry, Purple, Carrot, Greek Yogurt, and Oat Pouch; Butternut Squash, Carrot, and Chickpea Pouch; Apple, Cauliflower, and Leek Pouch; Banana, White Bean, Strawberry, and Chia Protein and Fiber Pouch; Mango, Pineapple, White Bean, Butternut Squash, and Oat Pouch; Banana, Kiwi, Spinach, Greek Yogurt, and Barley Pouch; Banana, Blueberry, Sweet Potato, Carrot, Greek Yogurt, and Millet Pouch; Apple and Carrot Pouch; Apple and Broccoli Pouch; Pear, White Bean, Blueberry, Date, and Chia Pouch; Apple, Spinach, and Avocado Pouch; Carrot, Sweet Potato, Corn, Pea, and Chicken with Quinoa and Leek Pouch; Just Sweet Potato Pouch; Pear and Mango Pouch; Carrot, Chickpea, Pea, Beef, and Tomato with Celery, Date, and Onion Pouch; Apple, Raspberry, Spinach, and Greek Yogurt Pouch; Sweet Potato, Banana, Passionfruit, Yogurt Pouch; Carrot, Spinach, Turkey, Corn, Apple and Potato Pouch; Strawberry, Banana, Greek Yogurt, Kale, Amaranth, and Oat Pouch; Apple, Plum, Berry, and Barley Pouch; Banana and Pumpkin Pouch; Mango, Sweet Potato, Apple, and Millet Pouch; Banana, Zucchini, and Amaranth Pouch; Peach,

11

Banana, and Apricot Pouch; Mighty Morning Apple Cinnamon Bar; and Mighty

Snack Bars – Blueberry.

b.   Plaintiff Gross purchased products from Defendant Hain (Earth's Best Organics),

namely Organic Sesame Street Peanut Butter Puffs; Banana, Raspberry, and Brown

Rice Baby Pouch; and Whole Grain Oatmeal Cereal.

c.   Plaintiff Gross purchased products from Defendant Gerber, namely Fruit and

Veggie Melts Very Berry Blend Freeze-Dried Snack; Fruit and Veggie Melts Truly

Tropical Blend Freeze-Dried Snack; Yogurt Melts - Mixed Berry; Yogurt Melts –

Strawberry; Puffs - Sweet Potato Cereal Baby Snack; Puffs – Blueberry; Puffs –

Peach; Puffs – Banana; Probiotic Oatmeal Peach Apple; Oatmeal Single Grain

Cereal; Lil' Crunchies Mild Cheddar Baked Corn Snacks; Lil' Crunchies Apple

Sweet Potato Baked Corn Snacks; Lil' Crunchies Garden Tomato Baked Corn

Snacks; Organic Pear and Spinach Pouch; Organic Apple, Blueberry, Spinach

Pouch; Prunes with Apples Puree; and Prunes Puree.

d.   Plaintiff Gross purchased products from Defendant Nurture Inc. (HappyBaby),

namely Love My Veggie Straws - Cheddar and Spinach; Blueberry and Purple

Carrot Teethers; Sweet Potato and Banana Teethers; Yogis - Banana and Mango

Freeze-Dried Yogurt and Fruit Snacks; Yogis - Strawberry Freeze-Dried Yogurt

and Fruit Snacks; Yogis - Mixed Berry Freeze-Dried Yogurt and Fruit Snacks;

Organic Creamies Freeze-Dried Veggie and Fruit snack with Coconut Milk -

Strawberry, Raspberry, and Carrot; Oats and Quinoa Ancient Grains Baby Cereal;

Purple Carrot and Blueberry Superfood Puffs; Apple and Broccoli Superfood Puffs;

Banana and Pumpkin Superfood Puffs; Kale and Spinach Superfood Puffs;

Strawberry and Beet Superfood Puffs; Sweet Potato and Carrot Superfood Puffs; Spinach, Apples, Sweet Potatoes, and Kiwi Pouch; Apples, Kale, and Avocados Pouch; Apples, Butternut Squash, and Super Chia Pouch; Banana, Peaches, Mango, and Super Chia pouch; Bananas, Raspberries, and Oats Pouch; Green Beans, Pears, Peas, and Super Chia Pouch; Carrots, Bananas, Mango, and Sweet Potatoes Pouch; Apples, Pumpkin, and Carrots Pouch; Apples, Sweet Potato, Carrots, Cinnamon and Super Chia Pouch; Pears, Mangos, Spinach, and Super Chia Pouch; Pears, Blueberries, Beets, and Super Chia Pouch; Pears, Blueberries, and Spinach Pouch; Pears, Kale, and Spinach Pouch; Pears, Mango, and Spinach Pouch; Pears, Kiwi, and Kale Pouch; Pears, Peaches, Pumpkin, Apples, and Cinnamon Pouch; Pears, Raspberries, Carrots, and Butternut Squash Pouch; Fiber and Protein Organic Soft Baked Oat Bars - Bananas and Carrots; Fiber and Protein Organic Soft Baked Oat Bars - Apples and Spinach; Love My Veggies Chickpea Straws with Sweet Potato and Rosemary; and Love My Veggies Chickpea Straws with Cheddar and Spinach.

e. Plaintiff Gross purchased products from Defendant Sprout Organic, namely Root Vegetables, Apple with Beef Pouch; Creamy Vegetables with Chicken Pouch; Garden Vegetables, Brown Rice with Turkey pouch; and Apple, Oatmeal, Raisin with Cinnamon Pouch.

28.    Prior to purchasing these baby foods, Plaintiff Gross saw Defendants' advertisements, claims on the packaging alleging the food was nutritious, healthy and safe, and she relied on these repetitions in purchasing food for her daughter. During that time, based on Defendants' omissions and the false and misleading claims, warranties, representations, advertisements and other marketing, Plaintiff was unaware that these products contained any level

of heavy metals, chemicals or toxins, and would not have purchased the food if that was fully disclosed, or she would not have paid as much for the baby foods if that information was fully disclosed. Plaintiff was injured by paying a premium for the baby foods that have no or very little value—or whose value was at least less than what she paid—based on the presence of the alleged heavy metals, chemicals, and toxins. Plaintiff Gross has suffered anguish and concern for her daughter since it has been revealed that these products contain high levels of heavy metals.

29.     Plaintiff Stevie McCartin is a resident of Washington D.C. and purchased baby foods for her children produced by Defendants.

    a.  Plaintiff McCartin purchased products from Defendant Plum Organics, namely Sweet Potato; Pear Purple Carrot and Blueberry; and Peas, Spinach, and Peas Pouches.

    b.  Plaintiff McCartin purchased products from Defendant Gerber, namely Banana Pouches.

    c.  Plaintiff McCartin purchased products from Defendant HappyBaby, namely Pumpkin and Banana Pouches.

    d.  Plaintiff McCartin purchased products from Defendant Beech Nut, namely Apple and Banana, Oat and Cinnamon Pouches.

30.     Prior to purchasing these baby foods, Plaintiff McCartin saw Defendants' advertisements, claims on the packaging alleging the food was nutritious, healthy and safe, and she relied on these repetitions in purchasing food for her sons. During that time, based on Defendants' omissions and the false and misleading claims, warranties, representations, advertisements and other marketing, Plaintiff was unaware that these products contained any level of heavy metals, chemicals or toxins, and would not have purchased the food if that was fully

disclosed, or she would not have paid as much for the baby foods if that information was fully disclosed. Plaintiff was injured by paying a premium for the baby foods that have no or very little value—or whose value was at least less than what she paid—based on the presence of the alleged heavy metals, chemicals, and toxins. Plaintiff McCartin has suffered anguish and concern for her sons since it has been revealed that these products contain high levels of heavy metals.

31. Plaintiff Elaine Lake is a resident of Kansas and purchased baby foods for her children produced by Defendants.

j. Plaintiff Lake purchased products from Defendant Plum Organics, namely Prunes, Peaches, Sweet potatoes, Strawberry, Banana granola, Peach banana apricot.

k. Plaintiff Lake purchased products from Defendant Gerber, namely rice cereal, sweet potatoes, banana, peas, green beans, strawberry kiwi puffs, apple, butternut squash and puffs.

l. Plaintiff Lake purchased products from Defendant Nurture, namely teethers, puffs and apple blueberry oats.

m. Plaintiff McCartin purchased products from Defendant Hain, namely Earth's Best: Sweet potatoes, Oatmeal cereal, Banana blueberry and Carrots.

32. Prior to purchasing these baby foods, Plaintiff Lake saw Defendants' advertisements, claims on the packaging alleging the food was nutritious, healthy and safe, and she relied on these repetitions in purchasing food for her children. During that time, based on Defendants' omissions and the false and misleading claims, warranties, representations, advertisements and other marketing, Plaintiff was unaware that these products contained any level of heavy metals, chemicals or toxins, and would not have purchased the food if that was fully disclosed, or she would not have paid as much for the baby foods if that information was fully

disclosed. Plaintiff was injured by paying a premium for the baby foods that have no or very little value—or whose value was at least less than what she paid—based on the presence of the alleged heavy metals, chemicals, and toxins. Plaintiff Lake has suffered anguish and concern for her son and daughter since it has been revealed that these products contain high levels of heavy metals.

33.     Plaintiff Courtney Nemmers is a resident of the state of Kansas and purchased baby foods for her children produced by Defendants.

n.     Plaintiff Nemmers purchased products from Defendant Beech-Nut, namely Sweet Potatoes, Pears, Apple Kiwi Spinach, Apple Raspberry Avocado, Sweet Corn & Green Beans, Apple & Blackberry, Carrot, Green beans, Apple, Banana, Mango, Pear Kale Cucumber, and Banana Cinnamon & Granola.

o.     Plaintiff Nemmers purchased products from Defendant Campbell, namely Plum Organics Pear Purple Carrot & Blueberry, Carrot Sweet Potato Corn Pea, Apple Carrot Pouches, Pear Mango Pouches, Pear Spinach Pea, Peach banana Apricot, Apple Broccoli, Carrot Sweet Potato Corn Pea Chicken, Apple Spinach Avocado, JUST Sweet Potato, JUST Prunes, JUST mangos, Mighty Morning Banana Blueberry Oat Quinoa, Super Smoothie Pear Sweet Potato Spinach Blueberry Bean & Oat, Mighty Snack Bars Strawberry, Mighty Snack Bars Blueberry, Sammy Jammy's Peanut butter & Strawberry, and Sammy Jammy's Blueberry & Oatmeal. Plaintiff Nemmers purchased products from Defendant Nurture, namely HappyBaby Clearly Crafted Apples, Blueberry & Oats, Strawberry & Beet Superfood BabyPuffs, Organic Creamies of all flavors, Organic Yogis of all flavors, and Happy Baby Teethers of all flavors, and nearly all flavors of the SuperFood BabyPuffs.

p.   Plaintiff Nemmers purchased products from Defendant Hain, Namely Earth's Best Organic Apple Peach Oatmeal, Blueberry Banana Flax & Oat, Banana Raspberry & Brown rice, Butternut Squash Pear, Banana, Pasta with Tomato & White Bean, Sweet Potato & Apple, Apple Raisin Flax & Oat, Apple Strawberry, Organic Sunny Day Snack Bars, and Strawberry Peach Pear Wholesome Breakfast. Plaintiff Nemmers purchased products from Defendant Gerber, namely Single Grain Oatmeal, Banana Baby Meal, Sweet Potato, Crawler Yogurt Blend, Banana, Pear, Carrot Sweet Potato Pea, Fruit & Veggie Melts, Yogurt Melts, and every flavor of Puffs.

34.   Prior to purchasing these baby foods, Plaintiff Nemmers saw Defendants' advertisements, claims on the packaging alleging the food was nutritious, healthy and safe, and she relied on these repetitions in purchasing food for her son and daughter. During that time, based on Defendants' omissions and the false and misleading claims, warranties, representations, advertisements and other marketing, Plaintiff was unaware that these products contained any level of heavy metals, chemicals or toxins, and would not have purchased the food if that was fully disclosed, or she would not have paid as much for the baby foods if that information was fully disclosed. Plaintiff was injured by paying a premium for the baby foods that have no or very little value—or whose value was at least less than what she paid—based on the presence of the alleged heavy metals, chemicals, and toxins. Plaintiff Nemmers has suffered anguish and concern for her son and daughter since it has been revealed that these products contain high levels of heavy metals.

35.   Plaintiff Tracy Tankard is a resident of the state of Kansas and purchased baby foods for her children produced by Defendants.

q.  Plaintiff Tankard purchased products from Defendant Gerber, namely Puffs Banana Cereal Baby Snacks and Fruit & Veggie Melts Very Berry Blend Freeze-Dried Snacks.

r.  Plaintiff Tankard purchased products from Defendant Nuture, Inc.'s Happy Family Organics, namely HappyBaby Organic Yogis Strawberry Banana Freeze Dried Greek Yogurt & Fruit Baby Snacks.

36.  Prior to purchasing these baby foods, Plaintiff Tankard saw Defendants' advertisements, claims on the packaging alleging the food was nutritious, healthy and safe, and she relied on these repetitions in purchasing food for her sons. During that time, based on Defendants' omissions and the false and misleading claims, warranties, representations, advertisements and other marketing, Plaintiff was unaware that these products contained any level of heavy metals, chemicals or toxins, and would not have purchased the food if that was fully disclosed, or she would not have paid as much for the baby foods if that information was fully disclosed. Plaintiff was injured by paying a premium for the baby foods that have no or very little value—or whose value was at least less than what she paid—based on the presence of the alleged heavy metals, chemicals, and toxins. Plaintiff Tankard has suffered anguish and concern for her sons since it has been revealed that these products contain high levels of heavy metals.

37.  Plaintiff Mallory VanDyke is a resident of the state of Kansas and purchased baby foods for her children produced by Defendants.

a.  Plaintiff VanDyke purchased products from Defendant Hain, namely Earth's Best Organic fruits and vegetables.

b.  Plaintiff VanDyke purchased products from Defendant Campbell, namely Plum Organics Banana Blueberry Oat & Quinoa Fruit Pouches, Pear Sweet Potato

     Spinach Blueberry Bean & Oat Pouches, Pear Purple Carrot & Blueberry Pouches, Peach Banana & Apricot Pouches, and Banana Blueberry Sweet Potato & Carrot Pouches.

c.   Plaintiff VanDyke purchased products from Defendant Nurture, namely HappyBaby Pears Mangos & Spinach Pouches, Bananas Raspberries & Oats Pouches, Bananas Sweet Potatoes & Papaya Pouches, Bananas Pineapple Avocado & Granola Pouches, Carrots Strawberries & Chickpeas Pouches, Mango & Pumpkin Teether Crackers, Blueberries & Purple Carrot Teether Crackers, and Sweet Potato & Banana Teether Crackers.

d.   Plaintiff VanDyke purchased products from Defendant Gerber, namely fruits and vegetables, pouches and puffs.

38.   Prior to purchasing these baby foods, Plaintiff VanDyke saw Defendants' advertisements, claims on the packaging alleging the food was nutritious, healthy and safe, and she relied on these repetitions in purchasing food for her son and daughter. During that time, based on Defendants' omissions and the false and misleading claims, warranties, representations, advertisements and other marketing, Plaintiff was unaware that these products contained any level of heavy metals, chemicals or toxins, and would not have purchased the food if that was fully disclosed, or she would not have paid as much for the baby foods if that information was fully disclosed. Plaintiff was injured by paying a premium for the baby foods that have no or very little value—or whose value was at least less than what she paid—based on the presence of the alleged heavy metals, chemicals, and toxins. Plaintiff Vandyke has suffered anguish and concern for her son and daughter since it has been revealed that these products contain high levels of heavy metals.

39.    Plaintiff Jessica Scott is a resident of the state of New York and purchased baby foods for her children produced by Defendants.

s.    Plaintiff Scott purchased products from Defendant Gerber namely pouches, rice cereals, and teething snacks.

t.    Plaintiff Scott purchased products from Defendant Nurture namely Happy Baby Pouches, rice cereals, and teething snacks.

u.    Plaintiff Scott purchased products from Defendant Campbell Soup Company namely Plum Organics Pouches, rice cereals, and teething snacks.

40.    Prior to purchasing these baby foods, Plaintiff Scott saw Defendants' advertisements, claims on the packaging alleging the food was nutritious, healthy and safe, and she relied on these repetitions in purchasing food for her daughters. During that time, based on Defendants' omissions and the false and misleading claims, warranties, representations, advertisements and other marketing, Plaintiff was unaware that these products contained any level of heavy metals, chemicals or toxins, and would not have purchased the food if that was fully disclosed, or she would not have paid as much for the baby foods if that information was fully disclosed. Plaintiff was injured by paying a premium for the baby foods that have no or very little value—or whose value was at least less than what she paid—based on the presence of the alleged heavy metals, chemicals, and toxins. Plaintiff Scott has suffered anguish and concern for her children since it has been revealed that these products contain high levels of heavy metals.

41.    Plaintiffs bring this action individually and on behalf of all consumers who purchased baby foods manufactured by Defendants to cause the disclosure of the presence and/or risk of the presence of heavy metals and/or other toxins that do not conform to the labels, packaging, advertising, and statements in the baby food products; to correct the false and

misleading perception that Defendants created in the minds of consumers that their products are high quality, healthy, and safe for infant consumption; and to obtain redress for those who have purchased the baby food.

42. Defendant Beech-Nut Nutrition Company ("Beech-Nut") is incorporated in New York. Its headquarters and principal place of business is located at One Nutritious Place, Amsterdam, New York 12010.

43. Defendant formulates, develops, manufactures, labels, distributes, markets, advertises, and sells under the baby food brand names Beech-Nut throughout the United States, including in this District, during the Class Period (defined below). The advertising, labeling, and packaging for these products, relied upon by Plaintiffs were prepared, reviewed, and/or approved by Defendant and its agents, and were disseminated by Defendant and its agents through marketing, advertising, packaging, and labeling that contained the misrepresentations alleged herein. The marketing, advertising, packaging, and labeling for these baby foods were designed to encourage consumers to purchase them and reasonably misled the reasonable consumer, i.e., Plaintiffs and the Class, into purchasing them. Defendant owns, manufactures, and distributes the baby foods, and created, allowed, negligently oversaw, and/or authorized the unlawful, fraudulent, unfair, misleading, and/or deceptive labeling and advertising for the baby foods. Defendant is responsible for sourcing ingredients, manufacturing the products, and conducting all relevant quality assurance protocols, including testing, for the ingredients and finished baby foods.

44. Defendant Campbell Soup Company ("Campbell") is incorporated in Delaware. Its headquarters and principal place of business is located at 1 Campbell Place, Camden, NJ 08103-1701.

45.     Defendant formulates, develops, manufactures, labels, distributes, markets, advertises, and sells under the baby food brand name Plum Organics throughout the United States, including in this District, during the Class Period (defined below). The advertising, labeling, and packaging for these products, relied upon by Plaintiffs were prepared, reviewed, and/or approved by Defendant and its agents, and were disseminated by Defendant and its agents through marketing, advertising, packaging, and labeling that contained the misrepresentations alleged herein. The marketing, advertising, packaging, and labeling for these baby foods were designed to encourage consumers to purchase them and reasonably misled the reasonable consumer, i.e., Plaintiffs and the Class, into purchasing them. Defendant owns, manufactures, and distributes the baby foods, and created, allowed, negligently oversaw, and/or authorized the unlawful, fraudulent, unfair, misleading, and/or deceptive labeling and advertising for the baby foods. Defendant is responsible for sourcing ingredients, manufacturing the products, and conducting all relevant quality assurance protocols, including testing, for the ingredients and finished baby foods.

46.     Defendant Gerber Products Company ("Gerber") (a/k/a Nestle Nutrition, Nestle Infant Nutrition or Nestle Nutrition North America) is incorporated in Michigan. Its headquarters and principal place of business is located at 12 Vreeland Road, 2nd Fl., Florham Park, New Jersey.

47.     Defendant formulates, develops, manufactures, labels, distributes, markets, advertises, and sells under the baby food brand name Gerber throughout the United States, including in this District, during the Class Period (defined below). The advertising, labeling, and packaging for these products, relied upon by Plaintiffs were prepared, reviewed, and/or approved by Defendant and its agents, and were disseminated by Defendant and its agents through marketing, advertising, packaging, and labeling that contained the misrepresentations alleged

herein. The marketing, advertising, packaging, and labeling for these baby foods were designed to encourage consumers to purchase them and reasonably misled the reasonable consumer, i.e., Plaintiffs and the Class, into purchasing them. Defendant owns, manufactures, and distributes the baby foods, and created, allowed, negligently oversaw, and/or authorized the unlawful, fraudulent, unfair, misleading, and/or deceptive labeling and advertising for the baby foods. Defendant is responsible for sourcing ingredients, manufacturing the products, and conducting all relevant quality assurance protocols, including testing, for the ingredients and finished baby foods.

48.    Defendant The Hain Celestial Group, Inc. ("Hain") is incorporated in Delaware. Its headquarters and principal place of business is located at 1111 Marcus Avenue, #1, Lake Success, NY 11042.

49.    Defendant formulates, develops, manufactures, labels, distributes, markets, advertises, and sells under the baby food brand name Earth's Best Organics throughout the United States, including in this District, during the Class Period (defined below). The advertising, labeling, and packaging for these products, relied upon by Plaintiffs were prepared, reviewed, and/or approved by Defendant and its agents, and were disseminated by Defendant and its agents through marketing, advertising, packaging, and labeling that contained the misrepresentations alleged herein. The marketing, advertising, packaging, and labeling for these baby foods were designed to encourage consumers to purchase them and reasonably misled the reasonable consumer, i.e., Plaintiffs and the Class, into purchasing them. Defendant owns, manufactures, and distributes the baby foods, and created, allowed, negligently oversaw, and/or authorized the unlawful, fraudulent, unfair, misleading, and/or deceptive labeling and advertising for the baby foods. Defendant is responsible for sourcing ingredients, manufacturing the products, and

conducting all relevant quality assurance protocols, including testing, for the ingredients and finished baby foods.

50.    Defendant Nurture, Inc. ("Nurture") is incorporated in Delaware. Its headquarters and principal place of business is located at 1 Maple Avenue, White Plains, NY 10605.

51.    Defendant formulates, develops, manufactures, labels, distributes, markets, advertises, and sells under the baby food brand names HappyBaby and HappyFamily throughout the United States, including in this District, during the Class Period (defined below). The advertising, labeling, and packaging for these products, relied upon by Plaintiffs were prepared, reviewed, and/or approved by Defendant and its agents, and were disseminated by Defendant and its agents through marketing, advertising, packaging, and labeling that contained the misrepresentations alleged herein. The marketing, advertising, packaging, and labeling for these baby foods were designed to encourage consumers to purchase them and reasonably misled the reasonable consumer, i.e., Plaintiffs and the Class, into purchasing them. Defendant owns, manufactures, and distributes the baby foods, and created, allowed, negligently oversaw, and/or authorized the unlawful, fraudulent, unfair, misleading, and/or deceptive labeling and advertising for the baby foods. Defendant is responsible for sourcing ingredients, manufacturing the products, and conducting all relevant quality assurance protocols, including testing, for the ingredients and finished baby foods.

52.    Defendant North Castle Partners ("North Castle") is incorporated in Delaware Its headquarters and principal place of business is located at 183 East Putnam Avenue, Greenwich, CT 06830.

53.    Defendant formulates, develops, manufactures, labels, distributes, markets, advertises, and sells under the baby food brand names Sprout Foods and Sprout Organics

throughout the United States, including in this District, during the Class Period (defined below). The advertising, labeling, and packaging for these products, relied upon by Plaintiffs were prepared, reviewed, and/or approved by Defendant and its agents, and were disseminated by Defendant and its agents through marketing, advertising, packaging, and labeling that contained the misrepresentations alleged herein. The marketing, advertising, packaging, and labeling for these baby foods were designed to encourage consumers to purchase them and reasonably misled the reasonable consumer, i.e., Plaintiffs and the Class, into purchasing them. Defendant owns, manufactures, and distributes the baby foods, and created, allowed, negligently oversaw, and/or authorized the unlawful, fraudulent, unfair, misleading, and/or deceptive labeling and advertising for the baby foods. Defendant is responsible for sourcing ingredients, manufacturing the products, and conducting all relevant quality assurance protocols, including testing, for the ingredients and finished baby foods.

54.    Defendant Walmart Stores, Inc. ("Walmart") is incorporated in Delaware. Its headquarters and principal place of business is located at 702 S.W. 8th St Bentonville, Arkansas 72716.

55.    Defendant formulates, develops, manufactures, labels, distributes, markets, advertises, and sells under the baby food brand Parent's Choice throughout the United States, including in this District, during the Class Period (defined below). The advertising, labeling, and packaging for these products, relied upon by Plaintiffs were prepared, reviewed, and/or approved by Defendant and its agents, and were disseminated by Defendant and its agents through marketing, advertising, packaging, and labeling that contained the misrepresentations alleged herein. The marketing, advertising, packaging, and labeling for these baby foods were designed to encourage consumers to purchase them and reasonably misled the reasonable consumer, i.e.,

25

Plaintiffs and the Class, into purchasing them. Defendant owns, manufactures, and distributes the baby foods, and created, allowed, negligently oversaw, and/or authorized the unlawful, fraudulent, unfair, misleading, and/or deceptive labeling and advertising for the baby foods. Defendant is responsible for sourcing ingredients, manufacturing the products, and conducting all relevant quality assurance protocols, including testing, for the ingredients and finished baby foods.

## III.    JURISDICTION

56.    This Court has subject matter jurisdiction over this class action pursuant to 18 U.S.C. § 1964(a) (civil RICO jurisdiction), 18 U.S.C. 1331 (federal question jurisdiction), and 28 U.S.C. § 1332(d)(2)(A) (CAFA jurisdiction).

57.    Venue is proper in this Court pursuant to 28 U.S.C. §1391, because Plaintiffs have suffered injury as a result of Defendants' acts in this district, many of the acts and transactions giving rise to this action occurred in this District, Defendants conduct substantial business in this district, Defendants have intentionally availed themselves of the laws, protections, and markets of this district, and Defendants are subject to personal jurisdiction in this district.

## IV.    BABY FOOD SALES MEANS BIG BUCKS FOR DEFENDANTS

### a. Baby Food is big business.

58.    Baby food manufacturers know that there are few things as precious as a newborn baby and that parents want the very best for their children—and that many parents are willing to pay premium dollars to ensure the quality and healthiness of the products they feed their babies.

59.    Given this demand, the world market for infant formula and baby food is large, growing, and very competitive with a forecast market value of almost $99 billion by 2024.[9]

60.    In the United States, the baby food market size was valued at $12.9 billion in 2018 and is projected to reach $17.2 billion by 2026.[10]

61.    Baby food is the most purchased baby product category in U.S. supermarkets.

62.    A market research group notes that "In the recent years, packaged baby food has been widely adopted by parents since it provides convenience and higher nutrition level. In addition, the rise in awareness among people about the numerous health advantages of feeding baby food to infants has significantly fueled the growth of the baby food market."[11]

63.    The growth in the baby food market is also driven by rising numbers of women working outside the home. "As many working mothers return to their jobs shortly after giving birth, prepared baby foods and formulas provide an appealing alternative for working mothers, bridging their desires for healthy, nutritious food with their need for convenience."[12]

---

[9] Emma Bedford, *U.S. baby food market –statistics & facts*, Statista. Nov. 20, 2020. https://www.statista.com/topics/1218/baby-food-market/ (last visited Feb. 16, 2021)

[10] *U.S. Baby Food Market Expected to Grow with a CAGR of 3.7% from 2019 to 2026*, Mar. 3, 2020, Yahoo! Finance. https://finance.yahoo.com/news/u-baby-food-market-expected-104400824.html?guccounter=1 (last visited Feb. 19, 2021)

[11] *Id.*

[12] *Oh, Baby! Trends in the Global Baby Food and Diaper Markets*, Aug. 2015. https://www.nielsen.com/wp-content/uploads/sites/3/2019/04/Global20Baby20Care20Report20Revised20FINAL-2.pdf    (last visited Feb. 18. 2021)

64.    The cereal segment of the baby food market is the largest in terms of revenue because these products are consumed by infants on a regular basis due to the fact that their high protein and vitamin content is necessary to promote overall growth. [13]

65.    A growing segment of this market is baby food labeled as organic. In North America, the organic baby food market had a value of $1.9 billion in 2018. As one market researcher concluded that the growth in the North America organic baby food market was being driven in part by the "increasing awareness among parents regarding the baby's nutrition, coupled with the health benefits associated with organic food products is driving the market growth in the region" and "the rising consumer awareness about the harmful effects of chemicals on the infant's health." [14]

66.    Another market research group noted that the strong growth of the organic market in North America: "Consumers are increasingly health conscious and looking for natural, minimally-processed foods, and the stakes are even higher when it comes to their babies." "More parents are seeking foods that set their children up for a healthy life—even if it comes at a premium. We expect this segment will continue to grow as more parents can afford to trade up." [15]

---

[13] *U.S. Baby Food Market Expected to Grow with a CAGR of 3.7% from 2019 to 2026*, Mar. 3, 2020, Yahoo! Finance.

[14] *North America Organic Baby Food Market Expected to Reach a Value of $3.32 Billion by 2024 with a CAGR of 9.6%.* BUSINESS WIRE. Jan. 20, 2020. https://www.businesswire.com/news/home/20200120005436/en/North-America-Organic-Baby-Food-Market-Expected-to-Reach-a-Value-of-3.32-Billion-by-2024-with-a-CAGR-of-9.6---ResearchAndMarkets.com (last visited Feb. 18, 2021)

[15] *Oh, Baby! Trends in the Global Baby Food and Diaper Markets*, Aug. 2015. https://www.nielsen.com/wp-content/uploads/sites/3/2019/04/Global20Baby20Care20Report20Revised20FINAL-2.pdf (last visited Feb. 18. 2021)

67.     While many millennial parents may have less children, market research shows they adopt a quality over quantity approach to the baby products they purchase. These parents prioritize organic and chemical-free baby products and are willing to pay a premium for healthy and high nourishment meals.[16]

68.     Even for value purchasers, these parents expect that all baby foods they buy will be safe and nutritious.[17]

69.     Parents look to endorsements from trusted sources like health experts in choosing baby food.

**b. Proven Hazardous Substance**

70.     As alleged throughout this Complaint and determined in the Report released by the Subcommittee, heavy metals such as lead, mercury, cadmium and arsenic are extremely toxic and dangerous to babies and young children.

71.     All four of the heavy metals (arsenic, cadmium, lead, and mercery) are defined by the Environmental Protection Agency as hazardous substances that may endanger public health and subject companies to strict liability clean-up and reporting requirements under the Comprehensive Environmental Response, Compensation, and Liability Act.

72.     *Arsenic* is ranked number one among substances present in the environment that pose the most significant potential threat to human health, according to the Department of Health and Human Services' Agency for Toxic Substances and Disease Registry (ATSDR).[18]

---

[16] *U.S. Baby Food Market Expected to Grow with a CAGR of 3.7% from 2019 to 2026*, Mar. 3, 2020, Yahoo! Finance.

[17] *Oh, Baby! Trends in the Global Baby Food and Diaper Markets*, Aug. 2015.

[18] Agency for Toxic Substances and Disease Registry, ATSDR's Substance Priority List (2019) (online at www.atsdr.cdc.gov/spl/index.html#2019spl)

73.     The known health risks of arsenic exposure include "respiratory, gastrointestinal, haematological, hepatic, renal, skin, neurological and immunological effects, as well as damaging effects on the central nervous system and cognitive development in children."[19]

74.     A study of Maine schoolchildren exposed to arsenic in drinking water found that children exposed to water with an arsenic concentration level greater than 5 parts per billion (ppb) "showed significant reductions in Full Scale IQ, Working Memory, Perceptual Reasoning and Verbal Comprehension scores." The authors pegged 5 ppb as an important threshold.[20]

75.     The FDA acknowledged the grave dangers in consumption of high levels of arsenic by infants: "FDA's risk assessment shows that inorganic arsenic exposure during fetal development, infancy, and childhood may contribute to neurodevelopmental effects, as well as increase lifetime cancer risk, and that establishing an action level will reduce inorganic arsenic exposure and risk."[21]

76.     The Environmental Protection Agency has set the maximum contaminant level (MCL) for arsenic to 10 micrograms per liter (or 10 parts per billion) for public drinking water systems, as have the European Union and the World Health Organization.

---

[19] The Report at 10, (citing Miguel Rodríguez-Barranco et al., Association of Arsenic, Cadmium and Manganese Exposure with Neurodevelopment and Behavioural Disorders in Children: A Systematic Review and Meta-Analysis (June 1, 2013) (online at https://pubmed.ncbi.nlm.nih.gov/23570911/)).

[20] Id. (citing Gail A. Wasserman et al., A Cross-Sectional Study of Well Water Arsenic and Child IQ in Maine Schoolchildren (Apr. 1, 2014) (online at https://ehjournal.biomedcentral.com/articles/10.1186/1476-069X-13-23)).

[21] U.S. Food & Drug Administration, Supporting Document for Action Level for Inorganic Arsenic in Rice Cereals for Infants, Aug. 2020, https://www.fda.gov/food/chemical-metals-natural-toxins-pesticides-guidance-documents-regulations/supporting-document-action-level-inorganic-arsenic-rice-cereals-infants.

77.    The FDA has already set maximum inorganic arsenic levels at 10 ppb for bottled water. FDA has also set the maximum amount of inorganic arsenic in infant rice cereals at 100 ppb.

78.    Consumer Reports suggests setting inorganic arsenic levels as low as 3 parts per billion (ppb).

79.    Organizations such as Healthy Babies Bright Futures have called for a goal of no measurable amount of inorganic arsenic in baby food.

80.    **Lead** is number two on ATSDR's list of substances present in the environment that pose the most significant potential threat to human health.[22]

81.    Even small doses of lead exposure are hazardous, particularly to children.[23]

82.    The FDA acknowledges that "even low-level chronic exposure" to lead "can be hazardous over time" because "lead can accumulate in the body."[24]

83.    Lead is associated with a range of bad health outcomes, including behavioral problems, decreased cognitive performance, delayed puberty, and reduced postnatal growth.

84.    FDA has set a 5 ppb lead standard for bottled water, WHO has set 10 ppb lead as a provisional guideline for drinking water, and EPA has set an action level of 15 ppb for lead in drinking water. FDA has also set standards for lead in juice (50 ppb) and candy (100 ppb). The European Union has set the maximum lead level in infant formula to 20 ppb.

---

[22] Agency for Toxic Substances and Disease Registry, ATSDR's Substance Priority List (2019) (online at www.atsdr.cdc.gov/spl/index.html#2019spl).

[23] The Report at 11, citing Philippe Grandjean, Even Low-Dose Lead Exposure Is Hazardous (Sept. 11, 2010) (online at https://pubmed.ncbi.nlm.nih.gov/20833288/).

[24] U.S. Food & Drug Administration, *Lead in Food, Foodwares, and Dietary Supplements*, https://www.fda.gov/food/metals-and-your-food/lead-food-foodwares-and-dietary-supplements (last updated Feb. 27, 2020).

85.     There is a growing consensus among health experts that lead levels in baby foods should not exceed 1 ppb. The American Academy for Pediatrics, the Environmental Defense Fund, and Consumer Reports have all, in some form, called for a 1 ppb level in food and drinks that babies and children consume.

86.     Healthy Babies Bright Futures has called for a goal of no measurable amount of lead in baby food.

87.     **Cadmium** is number seven on ATSDR's list of substances present in the environment that pose the most significant potential threat to human health.[25]

88.     Cadmium is associated with decreases in IQ, as well as the development of ADHD.

89.     EPA has a limit of 5 ppb of cadmium in drinking water, and FDA similarly has set a limit of 5 ppb in bottled water. The World Health Organization has set its limit for cadmium in drinking water at 3 ppb. The EU has set a limit ranging from 5–20 ppb cadmium for infant formula.

90.     Groups like Healthy Babies Bright Futures have set a goal of no measurable amount of cadmium in baby food. Consumer Reports has called for a limit of 1 ppb cadmium in fruit juices.

91.     **Mercury** is number three on ATSDR's list of substances present in the environment that pose the most significant potential threat to human health.

92.     EPA has capped mercury in drinking water at 2 ppb.

---

[25] Agency for Toxic Substances and Disease Registry, ATSDR's Substance Priority List (2019) (online at www.atsdr.cdc.gov/spl/index.html#2019spl).

93.    Consumer advocates urge even stricter standards for baby food. For example, Health Babies Bright Futures has called for a goal of no measurable amount of mercury in baby food.

**c. Defendants misrepresented their products as safe, healthy products.**

94.    Knowing that consumers valued the quality and safety of the baby food products that they fed their children, Defendants misrepresented the safety of their products and omitted information about the testing that showed risky levels of toxic heavy metals.

a.    **Hain Celestial Group**

95.    In promoting its Earth's Best Organic baby food products, Hain tells parents that its products are "time-trusted and safe" and "made from pure ingredients to help children grow up strong and healthy." Hain knew that parents cared about the whether "potentially harmful" contaminants were in their products because they noted that their food is "produced without the use of potentially harmful pesticides" but they omit that the products do contain other "potentially harmful" contaminants, namely toxic heavy metals.[26]

---

[26] http://www.hain.com/brandcats/baby-food/#c1 (last visited Feb. 18, 2021)





96.     Hain also represents to consumers that from day one, they have "recognized the importance of wholesome, pure nourishment for babies" so their products are "created with care, using pure, simple ingredients found in nature." Because of this "principle," Hain tells parents that they "can trust Earth's Best® products to be safe for your baby and safe for the environment."[27]

---

[27] https://www.earthsbest.com/why-earths-best/our-history/



Why Earth's Best    Products    Resources    Join Our Community    Looking for something?    ⌕    Find a Store ⌖    Contact Us



# Our History

### 30 years of Organic

Earth's Best® brand was founded by Ron Koss and Arnie Koss in 1985. From day one, they recognized the importance of wholesome, pure nourishment for babies. Embracing fruits handpicked from organic orchards and vegetables cultivated from the earth, Ron Koss and Arnie Koss believed in creating delicious, organic baby food while promoting environmental responsibility.

30 years later, The Hain Celestial Group, Inc. maintains this principle. Now offering a wide range of safe and gentle baby care products as well as nourishing foods, Earth's Best® products are created with care, using pure, simple ingredients found in nature. Made with love from the ground up, you can trust Earth's Best® products to be safe for your baby and safe for the environment.



Why Earth's Best    Products    Resources    Join Our Community    Looking for something?    ⌕    Find a Store ⌖    Contact Us

## Our Organic Ingredients

We ensure that the ingredients we procure for our products do not use potentially harmful pesticides or fertilizers. This rigorous quality assurance process allows us to meet the strict standards for organic certification.

- Earth's Best Organic® infant formulas are produced with milk from cows that are humanely raised and not treated with antibiotics or growth hormones.
- Earth's Best Organic® infant purees in both jars and pouches are produced from high quality, great tasting organic fruits and vegetables.

The Earth's Best Organic® brand is the first complete line of organic infant nutrition and care products. We strive to provide better-for-baby products that are pure, safe and sustainable.

97.    In discussing its organic ingredients, Hain claims that they have a "rigorous quality assurance process" which allows them to provide "better-for-baby products that are pure, safe and sustainable."[28]

98.    Hain repeatedly used this "rigorous product testing" as a their "promise" to parents

---

[28] https://www.earthsbest.com/why-earths-best/our-promise/ (last visited Feb. 16, 2021)

of their products' "quality and safety."[29]

## The Earth's Best Organic® Difference




- Organic ingredients grown without potentially harmful pesticides
- Unsweetened, unsalted, and no added modified starches
- Kosher certified products (excluding meat varieties)

- No genetically modified ingredients
- No artificial flavors, colors, or preservatives
- Rigorous product testing to guarantee quality and safety

99.     At the heart of their representations to parents about their products was Hain's "Promise" was to produce "pure, quality products you can trust."[30]



Producing pure, quality products you can trust.

**b. Beech-Nut**

---

[29] *Id.*

[30] *Id.*

100.    Beech-Nut advertises its products as being "natural" and including only "simple" ingredients and "nothing artificial." But Beech-Nut omits that the ingredients like dehydrated potato, sweet potato, prunes, carrots, spinach, cinnamon, oat flour, and rice flour contain high levels of arsenic, lead, and cadmium—all inorganic heavy metals.[31]



101.



## naturals banana, cinnamon & granola pouch

Beech-Nut Naturals® is made with real ingredients, gently cooked™. And with Beech-Nut Naturals® baby food pouches, you can conveniently take that real food on-the-go. For this Non-GMO Project verified pouch, we puree banana, cinnamon, and grains and gently cook it with indirect heat to preserve flavor and nutrients. The result is a hearty puree so delicious we had to show it off in a clear pouch. This Stage 2 Beech-Nut Naturals® banana, cinnamon & granola baby food pouch is ideal for your 6 month old baby. No sugar added and nothing artificial.

- Single, 3.5 oz Pouch
- Stage 2: for 6 months and up
- Real ingredients, gently cooked™
- Non-GMO Project verified
- Nothing artificial added
- Squeezable pouch for on-the-go

102.



## naturals spinach, zucchini & peas jar

Beech-Nut Naturals® baby food is made with real ingredients, gently cooked™. For Stage 2 Beech-Nut Naturals® spinach, zucchini & peas baby food, we start with non-GMO vegetables and gently cook them over indirect heat to preserve color, flavor and nutrients. The hearty texture of this puree helps introduce your growing baby to new tastes and textures of real food. As a Stage 2 puree, Beech-Nut Naturals® spinach, zucchini & peas is an ideal food for babies 6 months and up. All Beech-Nut® baby food jars are vacuum-sealed for freshness. This jar can be stored in the refrigerator for up to 3 days after opening.

- Single, 4 oz Jar
- Stage 2: for 6 months and up
- Real ingredients, gently cooked™
- Non-GMO Project verified
- Nothing artificial added
- Made with real vegetables



103.    Beech-Nut also knows that its consumers care about what's inside their baby food and stresses that the content "matters." It represents to customers that it has rigorous testing and sends back ingredients that are not good enough. But Beech-Nut does not tell consumers that it has accepted ingredients that have failed its own internal standards as well as national guidelines on heavy metal content.[32]



---

104.    Repeatedly, Beech-Nut stresses that it only uses "real," "quality" ingredients.[33]







105.    On social media on March 28, 2019, Beech-Nut advertised that its products are

for consumers who are "label readers" and look for "natural ingredients only."



106.    Similarly, on March 21, 2018, Beech-Nut represented to consumers that its

products contain "nothing else" but the listed ingredient.



107.    In 2018, when Consumer Reports reported on its independent testing showing Beech-Nut baby foods also included worrisome levels of toxic heavy metals, Beech-Nut sought to downplay the reports and assured parents that its baby foods were "healthy, nutritious and safe" and that it had already taken the recommended actions. It also inaccurately stated that "no government standard or recommendation exists for lead."[34] On August 16, 2018, this press release was also picked up by news media sites and relayed to the public.[35]

---

[34] https://www.beechnut.com/response-recent-consumer-reports-article/ (last visited Feb. 16, 2021)

[35] Thomas Barrabi, *Baby food brands contain 'worrisome' level of toxic metals: Gerber, Beech-Nut respond*, FOX BUSINESS (Aug. 16, 2018), https://www.foxbusiness.com/markets/baby-food-brands-contain-worrisome-level-of-toxic-metals-gerber-beech-nut-respond (last visited Feb. 15, 2021).

### Beech-Nut Response to the Recent Consumer Reports Article on Baby Food

We want to reassure parents that Beech-Nut's real food for babies is healthy, nutritious and safe. Our focus is on the safety and quality of the food we prepare for infants and toddlers.

The Consumer Reports baby food article recommends specific actions for manufacturers, including sourcing produce from areas less likely to be contaminated, and ensuring water and equipment used for manufacturing don't contribute to contamination. These actions have been an important part of Beech-Nut's quality and safety process for many years. We also want to assure parents that there is not a recall on any of our products, and we have high confidence in the quality and standards we use in making our food.

All produce – even the highest quality, organic and non-GMO fruits and vegetables you buy at the grocery store or a farmer's market – contain very tiny levels, or trace amounts, of lead and other elements because they exist naturally in soil, air and water. Our goal is and always has been to minimize the trace amounts of heavy metals in our products. Certain ingredients, like sweet potatoes and rice, are especially vulnerable because of their growing conditions.

Currently, no government standard or recommendation exists for lead. We continue to advocate for a government standard or recommendation for lead level, and we would welcome the opportunity to work with the FDA on science-based standards that food suppliers can implement across our industry.

Please visit our Food Quality & Safety page for more information on our food quality standards.

### c. Campbell Soup Company

108.    The mission that Campbell's Plum Organics promises is that it will provide "little ones" with "the very best food from the first bite." This message was relayed to the public over the wires and disseminated further on the internet on February 12, 2018 on Twitter.







109. Campbell represents to consumers that its baby foods are "absolutely" safe to eat and that "health and safety are always" its "top priorities."[36]

---

[36] https://www.plumorganics.com/faqs/ (last visited Feb. 16, 2021)

110.    Campbell understands that parents "want to know everything" that's in their foods and it represents that they do ingredient testing to have that understanding. [37]

- Why does Plum choose ingredient testing?

We believe ingredient testing allows for better control of the entire product and gets us ahead of any potential issues before it makes its way into a product. It's just like when you make a recipe at home – you want to know everything that's going into the recipe.

111.    Campbell understands that what it puts in its foods impacts child development and it represents to consumers that its baby foods can be critical in healthy eating. [38]



Believe it or not, baby's tiny palate starts budding in the womb! From pregnancy on through the first two years, food sparks baby's growth, informs taste preferences and impacts overall development. Read on to learn more about the critical role food plays in baby's incredible journey from womb to waddle.

112.

---

[37] *Id.*

[38] https://www.plumorganics.com/first-1000-days/ (last visited Feb. 16, 2021)

113.    On social media, Campbell through its Plum Organics brand represented to customers on June 7, 2019, that the back of the pouch lets customers "find out exactly what [you are] getting!"



#### d. Gerber

114.    Gerber knows that parents want "the very best" for their small children. It represents to parents that it has adopted "super strict" farming practices to ensure that their fruit and vegetable purees "are not only nutritious, but also wholesome and safe for even the littlest bodies." Gerber also misleadingly asserts its belief "that little ones deserve the highest standards set just for them" guides its mission to "deliver the very best fruits and veggies."[39]

---

[39] https://www.gerber.com/about-us (navigate to Clean Field Farming, click on Setting Higher Standards)



## Clean Field Farming™: Big Standards for Tiny Tummies

You want the very best for your little one to ensure she reaches her full potential, and so do we. That's why we use super strict Clean Field Farming™ practices to ensure that our fruit & veggie purees are not only nutritious, but also wholesome and safe for even the littlest bodies.

These unique practices guide the way we thoughtfully select our seeds and land, sustainably care for the soil, and trace our harvested crops not only to the farms, but to the very fields where they were grown. That's why we only partner with a select group of farms that meet our strict Clean Field Farming™ practices.

We think little ones deserve the highest standards set just for them. That's why we take our mission to deliver the very best fruits and veggies so seriously.

115.    Gerber also knows that parents don't want high levels of heavy metals in their baby foods and it represents that its growing standards are the strictest in the world to ensure "quality control" because "what you get out is what you put in."[40]

---

[40] https://www.gerber.com/about-us (navigate to Clean Field Farming, click on Soil Standards)



## Keeping Soil in the Family

Some soil can have naturally high levels of nitrates and heavy metals, which you don't want in your baby's food. That's why we created requirements for growing our fruits and veggies that are among the strictest in the world.

The Karnemaats have been working their farm in Michigan, perfecting techniques that maintain Gerber's high soil standards, for generations. To say quality control runs in the family would be an understatement. Dan Gerber, the founder of Gerber, used to walk the fields with great-grandfather Karnemaat. So they know that when it comes to soil, what you get out is what you put in.

116.    On its product pages, Gerber claims that its Clean Field Farming process "ensure[s] our purees are not only nutritious, but also wholesome and safe for every tiny tummy."[41]

117.



---

[41] https://www.gerber.com/carrot-0

118.    Gerber claims that its rice cereals will help support "learning ability" but they omit that they can contain levels of heavy metals associated with development issues. And, again, Gerber conveys to consumers that they can rely on its Clean Field Farming practices to ensure that its baby foods are "safe and wholesome."[42]



Following Clean Field Farming™ practices, we keep our grains safe and wholesome from farm to kitchen.

---

[42] https://www.gerber.com/gerber-organic-single-grain-cereal-rice

119.    On social media, Gerber stressed to consumers on October 12, 2020, that its Clean

Field Farming Standards allows it to "ensure that [our produce is] safe and wholesome for baby."



120.    In 2018, when Consumer Reports reported on its independent testing showing

Gerber baby foods also included worrisome levels of toxic heavy metals, Gerber sought to

downplay the reports and assured parents in a statement that was published on August 16, 2018:

"All of our foods meet our safety and quality standards, which are among the strictest in the

world." "Our rigorous standards are developed by evaluating the latest food safety guidance –

from sources like the Food and Drug Administration, Environmental Protection Agency, and

international health authorities. Gerber also partners with our farmers and our ingredient and packaging suppliers to control, reduce and limit contaminants in all our foods."[43]

  e. **Nurture**

121.  Nurture and its Happy Family Organics brand promise customers that they can have "peace of mind" because it "source[s] high-quality organic ingredients" and has "rigorous and uncompromising quality standards" so consumers "can feel confident" in what they are feeding their family.[44]

### Our Happy Promise

We work with trusted farmers and suppliers, source high-quality organic ingredients, and implement our rigorous and uncompromising quality standards so you can feel confident in what you're feeding your family. Our promise is to bring you peace of mind – so our products meet the following criteria:

Always certified USDA organic



Non-GMO



Grown without the use of toxic persistent pesticides



Packaging made without BPA, BPS, or phthalates

122.  Nurture emphasizes that it goes beyond USDA organic standards because it knows that what children eat in the first few years of life is "crucial." Nurture assures parents that it holds itself to "strict standards" to help children "grow healthy and strong" through "test[ing] and thoroughly analyz[ing] every batch of food."[45]

---

[43] Thomas Barrabi, *Baby food brands contain 'worrisome' level of toxic metals: Gerber, Beech-Nut respond*, FOX BUSINESS (Aug. 16, 2018), https://www.foxbusiness.com/markets/baby-food-brands-contain-worrisome-level-of-toxic-metals-gerber-beech-nut-respond (last visited Feb. 15, 2021)

[44] https://www.happyfamilyorganics.com/our-mission/going-beyond-organic-standards/

[45] https://www.happyfamilyorganics.com/our-mission/going-beyond-organic-standards/

123.    On social media, Nurture assured consumers on July 2, 2019, that it holds its "ingredients to the highest standards, because your baby deserves the best."



124.    Nurture also asserts that parents can "trust" its organic food because Nurture "partner[s] with pediatricians, dietitians, and children's health experts."[46]

---

[46] https://www.happyfamilyorganics.com/our-mission/going-beyond-organic-standards/

## Enlightened Nutrition

Our "Enlightened Nutrition" approach goes beyond USDA organic standards, because providing a healthy start is about more than using organic ingredients. What your little one eats in the first few years of life is crucial – it's important their diet provides the nutrients and vitamins needed for proper development.

As parents too, we hold ourselves to strict standards to provide your little one with products that, when part of a balanced diet, help them grow healthy and strong:



**Age & Stage Appropriateness**

We choose ingredients that make sense for your little one's age and stage.



**Quality & Safety**

We taste, test and thoroughly analyze every batch of food.



**Curated Ingredients**

We include key nutrients like DHA/ARA, prebiotic fiber, choline, and iron, plus superfoods like kale, quinoa, chia, and flaxseed, so your little one gets the most out of every bite.



**Our Partners**

We partner with pediatricians, dietitians, and children's health experts we trust- so your family can trust our organic food.

125.    Nurture makes similar promises about its health partners and the fact that parents can trust its organic food on its social media sites.



126.    Nurture claims that its HappyBABY puffs are "superfood" made by "a team of real parents, pediatricians, and nutritionists" to ensure "health and happiness to our little ones." But

they omit that these superfoods also include dangerously high levels of arsenic, lead, and cadmium that have even failed lenient internal standards.

 

127.    On social media, Nurture claimed on July 17, 2019, that these puffs "support brain health" but do not mention the levels of arsenic, lead, and cadmium that can cause developmental issues.



128.     Similarly, Nurture claims that their teethers are "the perfect first snack" but they omit that teethers have been sold with levels of lead higher than even lenient internal standards.

**About our Teethers**

The perfect first snack for baby's developing gums, our easily dissolving, organic teething wafers soothe and delight. They're made with jasmine rice flour, a touch of organic fruits and vegetables, and contain no artificial flavors for truly happy smiles.



129.    On social media on November 25, 2019, Nurture asserted that parents can skip the chemicals by purchasing its organic foods. But it does not mention that inorganic heavy metals are still present in its baby foods.



### f. North Castle/Sprout

130.    For years, Sprout has been deceptive about what's contained in its baby food. On October 25, 2016, Sprout triumphed its products: "[T]he first and only organic baby food brand **committed to honesty and transparency**, has launched clear food pouches for its line of organic baby food. The updated line features existing Sprout Organic Baby Food flavors in a transparent pouch so parents can see what's inside the pouch while they continue to feed their babies the flavors they love."[47]

---

[47] *Sprout Foods, the Market's Cleanest Ingredient Organic Baby Food Brand, Further Elevates Commitment to Honesty and Brand Transparency with New Clear Packaging,* Oct. 25. 2016,

131.    Sprout states that its "primary value is providing safe, health and delicious food products for children." They represent to parents that "if it isn't safe, healthy and delicious, we don't make it."[48]

132.    In a press release on August 21, 2017, Sprout touted its "award winning products" "made from whole, organic foods, and contain no GMOs (genetically modified organisms), preservatives, or anything artificial. Every ingredient is rigorously sourced to ensure the cleanest recipes are delivered to families."[49]

133.    On April 4, 2019, Sprout circulated a press release boasting about its commitment to providing healthy foods for children, in conjunction with Partnership for a Healthier America, stating "**The company is transparent in what it does so parents can be sure Sprout recipes feature what they want and nothing they don't**…. Sprout's use of clean, honest, pure and whole ingredients, along with plant-powered proteins, represent a better choice for parents and their children."[50]

---

https://www.prnewswire.com/news-releases/sprout-foods-the-markets-cleanest-ingredient-organic-baby-food-brand-further-elevates-commitment-to-honesty-and-brand-transparency-with-new-clear-packaging-300350493.html (last visited Feb. 18, 2021)

[48] http://www.sproutorganicfoods.com/faqs

[49] *Sprout Foods' Plant-Powered Purees and Snacks Honored With 2017 National Parenting Product Awards,* Aug. 21, 2017, https://www.prnewswire.com/news-releases/sprout-foods-plant-powered-purees-and-snacks-honored-with-2017-national-parenting-product-awards-300506789.html (last visited Feb. 17, 2017)

[50] *Sprout Foods Makes Commitment to Partnership for Healthier America,* Apr. 4, 2019, https://www.prnewswire.com/news-releases/sprout-foods-makes-commitment-to-partnership-for-a-healthier-america-300824801.html (last visited Feb. 17, 2021) (emphasis added)

134.

**Q**: WHAT ABOUT VALUES? What are the company's values and how does that affect your business practices?

Our primary value is providing safe, healthy and delicious food products for children. If it isn't safe, healthy and delicious, we don't make it. Our ingredients and packaging are carefully chosen to make the best products possible.

Every choice we make has to fit within our environmental value system, and we are continually looking for ways to improve our existing products. All along our supply chain we are working with our partners to make smarter choices for the environment.

135.    Sprout assures consumers that it "rigorously source[s] the ingredients used in our recipes to ensure the cleanest and safest food is delivered to your family."[51]



## Sourcing

We rigorously source the ingredients used in our recipes to ensure that the cleanest and safest food is delivered to your family. Learn more about the organic farms and farmers we've partnered with and how Sprout is committed to procuring ingredients that are certified organic, non-GMO, and preservative-free.

136.    On social media, Sprout told consumers on September 28, 2020, that they source "whole, organic farm-fresh veggies and fruits" "so you can let your little one dig in worry-free!"

---

[51] http://www.sproutorganicfoods.com/about-us/sourcing



137.    Sprout also pledged on August 1, 2020, that they only work with certified-organic growers to select the best whole veggies, fruits, and grains" and never use "anything artificial so you can be sure you're feeding your little one real, honest, pure foods that are not only good for them but super tasty, too!"



138.    On February 13, 2020, Sprout claimed that its puffs are made "with only 5 or 6 simple ingredients and nothing artificial!" But it omits that independent testing has shown these products can contain heavy metals.



139.     In 2018, when Consumer Reports reported on its independent testing showing Sprout baby foods also included worrisome levels of toxic heavy metals, Sprout sought to downplay the reports and assured parents in a statement published on August 16, 2018: "We are a responsible company with high safety standards for our ingredients and our products." "We are continuing to work with the fruit and vegetable industry to look for the cleanest sources of ingredients. We fully support the evolution of FDA safety regulations that help ensure the highest levels of food safety standards for babies."[52]

**g. Walmart**

140.     Walmart represents to parents that its "trust and safety guarantee" means that Walmart "takes care of everything little ones need."[53]

Parent's Choice Baby Products

Walmart's special range of products for baby has been the choice of parents in American homes for years. What started as a line of baby formula is now a complete baby collection specially selected with love and attention to this special time in your family's life. With a trust and safety guarantee to make shopping for baby easy, Parent's Choice takes care of everything little ones need at an every day low price.

141.     Walmart represents that its organic rice rusks are naturally flavored, but they omit that these can contain worrisome levels of heavy metals.

[52] Jesse Hirsch, *Heavy Metals in Baby Food: What You Need to Know, Consumer Reports* (Aug. 16, 2018), https://www.consumerreports.org/food-safety/heavy-metals-in-baby-food/ (last visited Feb. 15, 2018).

[53] https://www.walmart.com/cp/parents-choice-baby-products/4549164



142.    Similarly, Walmart claims that its yogurt cereal snacks are "great for you" and a "healthful choice for children learning to feed themselves."[54] But Walmart does not tell consumers that independent testing has shown that these products can contain heavy metals.

---

[54]https://www.walmart.com/ip/Parent-s-Choice-Strawberry-Yogurt-Bites-Stage-3-1-oz/23623496?selected=true



V.    **RAMPANT CRIMINAL ACTIVITY: THE NATION'S TOP BABY FOOD MANUFACTURERS ENGAGE IN WIDESPREAD FRAUD**

143.    For years, Defendants have been aware that their products contained dangerous levels of heavy metals, yet they failed to take action to minimize the amount of toxins in foods that would eventually be consumed by young children, toddlers and infants.

144.    This contamination, even in small amounts, can be lethal: "Infants are especially vulnerable because their bodies are so small, and on a per-pound basis, they're getting much

higher exposure than anyone else in the population." – Jane Houlihan, research director for

Healthy Babies Bright Futures, discussing arsenic exposure in baby food in 2017.[55]

145.    The Report by the U.S. House was certainly not the first time that Defendants were

put on notice about the rampant presence of heavy metals in their baby foods, it was just the time

that got the most attention and caught the attention of well-intentioned parents about that was in

their children's food.[56]

146.    In October 2017, a nonprofit focused on "bring[ing] truth and transparency to food

and consumer product labeling"[57] called Clean Label Project, dropped a scathing rebuke of baby

foods labeled as healthy, organic and clean. Clean Label Project purchased baby foods available

in grocery stores across America and independently tested them and the results were damning.

Clean Label Project noted:

a.    Over 30% of infant formulas and baby foods contained lead as well as many other

contaminants including arsenic, mercury, pesticides, acrylamides;

b.    Over 25 percent of all products tested exceeded at least one state or federal

guideline for contaminants;

c.    Over 50 percent of the products labeled "BPA free" tested positive for BPA;

---

[55] Roni Caryn Rabin, *Should You be Worried About the Arsenic in Your Baby Food?,* THE NEW YORK TIMES, Dec. 7, 2017.

[56] *See* Sally Kuzemchak, *Everything You Need to Know About Heavy Metals and Contaminants in Baby Food*, Feb. 4, 2021, https://www.parents.com/recipes/scoop-on-food/clean-label-project-study-finds-contaminants-in-formula-baby-food/ (last visited Feb. 14. 2021)

[57] Clean Label Project, Our Mission, https://cleanlabelproject.org/about-us/#our-mission (last visited Feb. 17, 2021)

    d.   Some products labeled "certified organic" actually had higher amounts of mercury and lead than conventional baby foods, although the organic baby foods had fewer pesticides;

    e.   Rice-based "puff" snacks had on average over 5 times as much arsenic as other baby snacks.[58]

147.   On December 11, 2017, in its attempts to minimize these findings, Defendant Campbell fired back in its typical, deceptive and vague fashion, claiming: "**We believe that Plum's products are safe to eat**. Our testing confirmed that the averaged results for heavy metals in all tested Plum products gave concentrations that are typical for those ingredients – whether that's a leafy green grown in your own garden or a bunch of carrots purchased at the farmer's market. The results also demonstrate our tested products are below exposure limits set by certain domestic and international regulatory bodies."[59]

148.   The following year, in 2018, Consumer Report's food safety group analyzed 50 nationally distributed baby and toddler foods for arsenic, lead, mercury and cadmium and found that 68% had worrisome levels of at least one of these metals and 15 of the foods posed potential health risks to a child eating just one serving or less per day.[60]

---

[58] Clean Label Project Press Release, *What are You Really Feeding Your Baby?* Oct. 25, 2017, https://cleanlabelproject.org/blog-post/clp-infant-formula-baby-food-test/ (last visited Feb. 16, 2021)

[59] Plum's Updated Response to Clean Label Project Report, Dec. 11, 2017, https://www.plumorganics.com/plums-response-clean-label-report/ (last visited Feb. 17, 2021) (emphasis added)

[60] Consumer Report, *CR renews call for FDA and manufacturers to take action to keep infants and children safe from heavy metals in foods*, Feb. 4, 2021. https://advocacy.consumerreports.org/press_release/cr-renews-call-for-fda-and-manufacturers-to-take-action-to-keep-infants-and-children-safe-from-heavy-metals-in-foods/ (last visited Feb. 12, 20121)

149.    Plaintiffs and members of the class are particularly vulnerable to fraud and disinformation because they cannot ferret out food fraud and this information is purposefully not included on the food label by Defendants: "The foundation of food and consumer product safety in America is primarily focused on pathogen and microbiological contaminants. However, there is an increase in consumer, media, and academic attention being paid to the health consequences of exposure to heavy metals, pesticide residues, and plasticizers. **Yet, consumers will never find this information on product labels.** We are committed to changing the definition of food and consumer safety through the use of data, science, and transparency"[61], Clean Label Project updated its original findings to determine if baby food manufacturers such as Defendants cleaned up their act to reduce heavy metals in baby food.

150.    In August 2020, the Clean Label Project released an updated report, finding that nothing had changed. Of the 530 baby and toddler food products tested and "[t]he results of the baby food study were shocking." [62]

151.    These alarm bells sounded again in October 2019 when Healthy Babies Bright Futures released a report detailing the dangerous levels of toxins found in **95% of baby food**.[63] (hereinafter "Healthy Babies Report")[64]

152.    The Healthy Babies Report made stunning allegations about the containments in most baby foods, including:

---

[61] Clean Label Project, Our Mission, https://cleanlabelproject.org/about-us/#our-mission (last visited Feb. 17, 2021) (emphasis added)

[62] Clean Label Project, *Baby Food: A Puree of Plasticizers and Heavy Metals*, Aug. 10. 2020, https://cleanlabelproject.org/baby-food-white-paper/ (last visited Feb. 17, 2021) Exh. H.

[63] Healthy Babies Bright Futures, *What's In My Baby's Food?,* Oct. 2019, https://www.healthybabyfood.org/sites/healthybabyfoods.org/files/2019-10/BabyFoodReport_FULLREPORT_ENGLISH_R5b.pdf (last visited Feb. 12, 2021)

[64] *See* Exh. G. (emphasis added)

    a.   Arsenic, lead, mercury, and cadmium, four heavy metals found in the Baby Foods, are neurotoxins.[65]

    b.   Exposures to these four heavy metals "diminish quality of life, reduce academic achievement, and disturb behavior, with profound consequences for the welfare and productivity of entire societies."[66]

    c.   These four toxins can harm a baby's developing brain and nervous system" and cause negative impacts such as "the permanent loss of intellectual capacity and behavioral problems like attention-deficit hyperactivity disorder (ADHD)."[67]

    d.   Even in trace amounts found in food, these heavy metals can alter the developing brain and erode a child's IQ.[68]

    e.   These four heavy metals pose "troubling risks for babies, including cancer and lifelong deficits in intelligence…"[69]

153.    The report prompted another ambiguous and deceptive statement, this time from Defendant Beech-Nut—claiming "Our process starts with high-quality fruits and vegetables that meet BNN's own standards, which in some cases are 10 times stricter than those of the U.S. government. **For example, we test for 255 common contaminants, such as lead, other heavy metals and pesticides, to confirm that all the ingredients delivered to us and used in our products comply with our standards.  If they don't, we send them back**."[70]

---

[65] Healthy Babies Report at 6.

[66] *Id.*

[67] *Id.* at 6.

[68] *Id.* at 1.

[69] *Id.*

[70] Media Statement by Beech-Nut Nutrition, Oct. 17, 2019. https://www.beechnut.com/baby-food-council/

154.    Despite the findings made by Clean Label Project, Consumer Report and Healthy Babies Bright Futures, Defendants refused to cease their perilous practice of producing baby foods chalk full of dangerous toxins and continued to expose millions of babies to these harmful, dangerous ingredients.

155.    And despite knowing their products posed a significant risk to the developing minds and bodies of babies and young children, still today, Defendants warrant, promise, represent, mislead, label, and/or advertise that their baby food products are free of any heavy metals, and/or unnatural ingredients by making assurances that the foods are natural, pure, healthy and safe for infant consumption.

156.    Defendant's knowingly acted in manufacturing baby foods with high levels of heavy metals with a realization of the imminence of danger and a reckless disregard or complete indifference to the probable consequences of the actions to the babies and children who ingested their products.

157.    Defendants' scienter and clear indifference to the fact that Plaintiffs, members of the putative class and consumers were repeatedly purchasing products that did not conform to what they were advertised as being, and that, in fact, parents were paying for products that contained potential toxins and that could lead to a plethora of potential cognitive and health problems for their children down the road, constituted wantonness on the behalf of Defendants.

158.    The Report by the U.S. House of Representatives only recently confirmed this and explicitly revealed that Defendants were knowingly, recklessly, and/or negligently selling baby foods containing arsenic, mercury, cadmium, lead, and other high levels of toxic heavy metals.

159.    As Michael Hansen from Consumer Reports stated, "You can't just allow the companies to do their own thing[ ]"[71] because their "own thing" is producing hundreds of foods, meals and snacks full of toxins which could cause irreparable harm to the babies who ingest them.

## VI.    DEFENDANTS HAVE BEEN AWARE OF HIGH HEAVY METAL CONTAMINATION IN THEIR PRODUCTS BUT HAVE FAILED TO TAKE ACTION

160.    As reported by Congress, Defendants Beech-Nut, Gerber, Hain, and Nurture knew these heavy metals posed a threat and set their own internal standards for how much of these toxins were present in their product—although then proceeded to continue to turn a blind eye to their dangers by selling food that contained heavy metals that far exceeded these levels.

161.    While standards set by the FDA or other governmental entities may provide guidance on what levels are safe in baby food, the lack of any mandated standard doesn't allow Defendants to simply ignore what the research says about the harm associated with these high levels of heavy metals in baby food.

162.    Defendants capitalized on the FDA's shortcomings in regulating the baby food industry and perpetually used ingredients and processes that led to high levels of heavy metals with no regard for the harm to children.

163.    When confronted by the U.S. House of Representatives regarding the heavy doses of these toxins in these baby foods, Defendants gloated about their products conforming with (nonexistent) regulations.

---

[71] Dee-Ann Durbin, *Congressional report finds toxic metals in baby food brands*, WASH. POST, (Feb. 4, 2021) https://www.washingtonpost.com/business/congressional-report-finds-toxic-metals-in-baby-food-brands/2021/02/04/adcf72c2-673a-11eb-bab8-707f8769d785_story.html (last visited Feb. 13. 2021)

a. December 11, 2019: "Campbell has conducted testing on every Plum Organics product on the market to ensure **none exceed acceptable levels of arsenic, lead, cadmium, or mercury**… To date, no Plum Organics foods have been found to be above exposure limits set by available domestic and international regulatory bodies… "[72]

b. December 19, 2019: "(Gerber) takes all concerns related to safety very seriously, which is why all of our foods and beverages meet our safety and quality standards and conform to all regulatory compliance guidelines."[73]

c. February 5, 2021: Gerber standards "are among the strictest in not just the US, but the world… where government standards don't currently exist, we develop our own rigorous standards"[74]

d. February 4, 2021: Hain—who secretly met with the FDA and confidentially (without telling Plaintiffs or the Class) stated to the FDA that their foods had high levels of heavy metals—stated that "Our rigorous internal standards and testing procedures ensure **Earth's Best products meet or exceed the current federal**

---

[72] Letter from attorney Thomas Perrelli on behalf of Campbell to Chairman Raja Krishnamoorthi, Subcommittee on Economic and Consumer Policy, Committee on Oversight and Reform (Dec. 11, 2019) (emphasis added) Exh. F, attached hereto.

[73] Letter from Geber CEO William Partyka to Chairman Raja Krishnamoorthi, Subcommittee on Economic and Consumer Policy, Committee on Oversight and Reform (Dec. 19, 2019) Exh. E, attached hereto.

[74] Sandee LaMotte, *Leading baby food manufactures knowingly sold products with high levels of toxic metals, a congressional investigation found*, CNN, Feb. 5, 2021. http://lite.cnn.com/en/article/h_70f72c54f916c524cf6b759a5d57c2cc (last visited Feb. 16, 2021)

**guidelines**."[75] In other words, Hain privately confessed while it publicly lied and concealed its food fraud—the worst of all worlds.

e.  February 2021: Nurture doubled-down about the safety and health of its products were: "We can say with the **utmost confidence** that **all** Happy Family Organics products are safe for babies and toddlers to enjoy and we are proud to have **best-in-class testing protocols** in our industry. We only sell products that have been rigorously tested and **we do not have products in-market with contaminant ranges outside of the limits set by the FDA**."[76]

f.  February 5, 2021: "We want to **reassure** parents Beech Nut products **are safe** and nutritious…. We look forward to continuing to work with the FDA, in partnership **with the Baby Food Council**…"[77]

g.  Sprout Organics has been notably silent in their refusal to cooperate with the Subcommittee and their products were deemed to contain toxic levels of heavy metals.

h.  February 4, 2021: Walmart/Parent's Choice also discussed their food being compliant with nonexistent FDA standards— "[we] tested 7 Walmart private label products and…. **The metals tested were within FDA guidance levels**" and stating

---

[75]  Hain Press Release, Feb. 4, 2021. https://ir.hain.com/news-releases/news-release-details/statement-behalf-earths-best-organic-response-congressional (last visited Feb. 15, 2021) (emphasis added)

[76]  Happy Family Organics, https://www.happyfamilyorganics.com/quality-and-safety-of-our-products/ (last visited Feb. 15, 2021) (emphasis added)

[77]  Elaine Watson, *Baby food brands defend protocols as congressional report alleges 'highly dangerous' levels of heavy metals in infant foods; expect lawsuits, stays attorney,* FOOD NAVIGATOR, Feb. 5, 2021. https://www.foodnavigator-usa.com/Article/2021/02/05/Baby-food-brands-defend-protocols-as-congressional-report-alleges-highly-dangerous-levels-of-heavy-metals (last visited Feb 15, 2021) (emphasis added)

that Walmart private label supplies must comply with "internal finished goods specifications, which for baby and toddler food means the levels must meet or fall below the limits established by the FDA." [78]

164.    As these specific misrepresentations by each Defendant show, the bottom line was the sole consideration for Defendants and once they were caught, they engaged in a whole new round of fraud to conceal and prolong their schemes to defraud.

## VII.    USING BIG TOBACCO'S PLAYBOOK, DEFENDANTS RUSH TO CREATE THE BABY FOOD COUNCIL AND EACH USES IT AS A VESSEL FOR FRAUD

165.    As Congress began to sniff around in late 2018, Defendants turned to one of Big Tobacco's proven tricks: creating a seemingly independent and pro-consumer entity that suggested they were actually committed to stopping the very fraud they were directing and perpetrating. This new entity was called the Baby Food Council.

166.    The Baby Food Council, however, was created only in January 2019 and was quickly assembled like a scarecrow It was thrown together as a front organization by Defendants to mislead and deflect attention away from their ongoing fraud.

167.    This maneuver was borrowed directly out of the playbook of Big Tobacco, which decades earlier had employed public relations experts, lawyers, and lobbyists who worked to deceive the American public regarding the dangers of smoking:

In December 1953, the CEOs of the major tobacco companies met secretly in New York City. Their purpose was to counter the damage from studies linking smoking to lung cancer. A year earlier Reader's Digest—then the public's leading source of medical information—had printed an article entitled "Cancer by the Carton" (Norr 1952). After it appeared, cigarette sales plummeted for two years, the first such decline of the century except during the Great Depression.

---

[78] Elaine Watson, *Baby food brands defend protocols as congressional report alleges 'highly dangerous' levels of heavy metals in infant foods; expect lawsuits, stays attorney,* FOOD NAVIGATOR, Feb. 5, 2021. (emphasis added)

Working closely with John Hill, the founder of the public relations giant Hill & Knowlton, the industry created "A Frank Statement to Cigarette Smokers" and paid to have it published in 448 newspapers on January 4, 1954. To give the industry a human face, the statement included the signatures of the nation's top tobacco executives and assured Americans that "we accept an interest in people's health as a basic responsibility, paramount to every other consideration in our business." Furthermore, they promised that "we always have and always will cooperate closely with those whose task it is to safeguard the public's health" (Tobacco Industry Research Committee 1954).

The "Frank Statement" was a charade, the first step in a concerted, half-century-long campaign to mislead Americans about the catastrophic effects of smoking and to avoid public policy that might damage sales. Unearthed later, industry documents showed the repeated duplicity of its executives. Everything was at stake. The industry wanted desperately to prevent, or at least delay, shifts in public opinion that would permit a barrage of legislative, regulatory, and legal actions that would erode sales and profits.[79]

168.    Deception using a pro-consumer front group was deliberately engineered by tobacco executives as a form of misdirection and concealment: they would give money to seemingly independent universities so they could control the research and, more important, any results that were released. Big Tobacco realized that the "best public relations approach was for the industry to become a major sponsor of medical research. This tactic offered several essential advantages. The call for new research implied that existing studies were inadequate or flawed. It made clear that there was more to know, and it made the industry seem a committed participant in the scientific enterprise rather than a self-interested critic."[80]

---

[79] Kelly D. Brownell & Kenneth E. Warner, *The Perils of Ignoring History: Big Tobacco Played Dirty and Millions Died. How Similar Is Big Food?*, Milbank Quarterly, Mar. 2009, 87(1): 259–294; available at: https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2879177/

[80] Allan Brandt, *Inventing Conflicts of Interest: A History of Tobacco Industry Tactics*, Am. J. Public Health, Jan. 2012, 102(1): 63-71, available at: https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3490543/

169.    In other words, Big Tobacco created "a research program that would be controlled by the industry yet promoted as independent. This was a public relations masterstroke. [Big Tobacco executives] understood that simply giving money to scientists—through the National Institutes of Health or some other entity, for example—offered little opportunity to shape the public relations environment. However, offering funds **directly to university-based scientists** would **enlist their support and dependence**. Moreover, it would have the added benefit of making academic institutions "partners" with the tobacco industry in its moment of crisis.[81]

170.    The food industry has already been exposed for following the Big Tobacco playbook:

> The tobacco team had **a playbook—a master plan and script that directed the behavior of industry executives, lobbyists, lawyers, scientists, and government officials friendly to the industry**. In A Question of Intent, a former FDA commissioner, David Kessler (2001, p. xiii), wrote:
>
>> Devised in the 1950s and '60s, the tobacco industry's strategy was embodied in a script written by the lawyers. Every tobacco company executive in the public eye was told to learn the script backwards and forwards, no deviation was allowed. The basic premise was simple—smoking had not been proved to cause cancer. Not proven, not proven, not proven—this would be stated insistently and repeatedly. Inject a thin wedge of doubt, create controversy, never deviate from the prepared line. It was a simple plan and it worked.
>
> The **food industry appears to have a strategy as well**, repeatedly carried to the public by spokespersons from food companies, trade associations, and their political allies.[82]

171.    The baby food industry has taken these same techniques, proven to work by Big Tobacco and already used by the overall food industry to beat back proof that bad foods cause obesity, and applied them to baby food manufacturing, sales, and marketing.

---

[81] *Id*. (emphasis added).

[82] *Id*. (emphasis added).

172.    Big Tobacco was stopped only by a civil RICO claim that broke apart the corrupt, coordinated corporate behavior that centered on fraudulent sales, marketing, and advertising of tobacco products to American purchasers. In an August 2006 judgment, a federal court ruled that several tobacco companies "systematically defrauded the American people by lying for decades about, among other things, the health effects of smoking and their marketing to children."[83]

173.    The baby food industry, among the four defendants, is mimicking Big Tobacco through the Baby Food Council. According to a website hosted on the food science department of Cornell University, "the Baby Food Council is a group of infant and toddler food companies" (supported by other entities) that was "created in January 2019."[84]

174.    This website lists as members, among others, Cornell University and the following Defendants: Beech-Nut, Hain, Gerber, and Danone (which is not a named Defendant but is a member presumably on behalf of Defendant Nurture, Inc., its domestic as subsidiary).

175.    Including Cornell University as a member (and having it host the website) is directly in line with Big Tobacco's playbook, and there is good reason to infer that the baby food industry is paying significant money to either Cornell University's food science department and/or the professors at Cornell who are running the Baby Food Council.

176.    Despite being involved in the Baby Food Council, Defendants knowingly violate several of the stated tenets of the Baby Food Council and take positions contradicted by the Council:

---

[83] Truth Initiative, Big Tobacco finally forced to tell the truth about its deadly products through court-ordered ads; Nov. 27, 2017; available at: https://truthinitiative.org/press/press-release/big-tobacco-finally-forced-tell-truth-about-its-deadly-products-through-court

[84] https://foodscience.cals.cornell.edu/industry-partnership-program/cifs-ipp-councils/

177.    First, the Baby Food Council affirmatively states that any exposure to contaminated foods is unacceptable because "there is no known safe level of exposure" for babies:

**Analysis of Baby Food Products for Heavy Metals**

A best practice to reduce heavy metals in vegetable and fruit purees is to regularly test ingredients and products for low levels of arsenic, cadmium, and lead to be able to identify and resolve potential problems. Accordingly, the FDA and food industry regularly test foods for various heavy metals, including arsenic, cadmium, and lead. These common food contaminants occur naturally or from pollution in the environment. Organic and conventional crops alike absorb them from soil and water. Their presence in baby food raises is a concern because babies are more sensitive to their harmful impacts. There is no known safe level of exposure to these metals; hence even low levels of contamination are a concern.

178.    Second, the Baby Food Council website states that it is also important to test "ingredients **and products**"—not simply each ingredient in isolation. Defendants violate this tenant by willfully testing only individual ingredients in isolation as an effort to sidestep the contamination of the products. Of course, babies ingest products, not ingredients in isolation, which renders this a sham.

179.    Third, the website refers to proper procedures (albeit in a short, simplistic discussion) for testing for "arsenic, cadmium, and lead"—yet Defendants did not follow these guidelines when knowingly manufacturing products with contaminants.

180.    Because of their financial contributions, Defendants were able to influence the content of the Council's website, however, in at least two ways.

181.    First, the Baby Food Council website falsely states that "contaminants naturally occur"—an obviously false statement that was included to mislead purchasers into believing the contamination in their food is naturally occurring, when it is not. In fact, "[t]oxic metals might be more common in baby foods because of the vitamins and minerals added to those foods during processing," according to Michael Hansen, senior staff scientist at Consumer Reports.

182.    Second, the website ignores mercury as a dangerous heavy metal that is included in baby food as a contaminant. The Council website speaks only to arsenic, cadmium, and lead—it leaves out mercury entirely, even though mercury is a well-known toxin present in baby food.

**A Dormant Entity**

183.    If it was not created by Defendants as a vessel for fraud, the Baby Food Council appears to have been infiltrated and taken over by Defendants. Several factors suggest this has occurred:

184.    First, despite being formed in January 2019, the Council has taken no steps on anything meaningful and cannot point to any activity it has taken that is contrary to the corporate interests of its members, including Defendants.

185.    Second, if the Baby Food Council were legitimately concerned with baby food, it would have, at a minimum, commented upon the practices of Defendants following the release of the February 2021 congressional study. Or, at the very least, it would have issued some statement regarding this bombshell, front page national news event. But the Baby Food Council, as of February 18, 2021, has said nothing. It has said and done nothing.

186.    Third, its website is hosted by the Food Science Department of Cornell University, which is odd. Cornell is merely a member of the Food Council but does not own or operate the entity on its own. Further discovery is needed for Plaintiffs to uncover the financial payments made by Defendants to Cornell and its faculty and any other connections between Defendants and Cornell and its food science department, including the professor listed on the Baby Food Council webpage (Professor Rui Hai Liu).

187.    Fourth, the Council has virtually no online presence. Its members frequently tout their membership as a defense to the fact they are engaging in food fraud, but the Council does

nothing. It issues no press releases, no guidance, no newsletter, no updates, no safety alerts—nothing.

188.    Fifth, the Council waited 10 months (from January to October 2019) before doing or saying anything, and that occurred only because it knew that its food manufacturer members (Defendants) were about to be hammered for major food fraud violations:

October 17, 2019

**FOR IMMEDIATE RELEASE**

(Washington, D.C. – October 17, 2019) Today, the Baby Food Council, a broad-based group of companies and other organizations formed in January 2019, announced its efforts to take on the challenge of reducing heavy metals in young children's food. This news comes as Healthy Babies Bright Futures (HBBF), a children's health advocacy group and member of the Council, released a new report demonstrating that tests on over 150 foods consumed by babies and toddlers found that 95% of the products tested had detectable levels of heavy metals. Recognizing that heavy metals are widely present in the environment and can get into food, the Council seeks to reduce levels of heavy metals in food products to as low as reasonably achievable using best-in-class management techniques.

189.

190.    This press release itself directly connects the Baby Food Council's activity to the incriminating HBBF report that was about to be issued. Had the HBBF report not been released, the Council would have taken no action. And even then, from October 2019 to present, nothing has changed. The Council and Defendants have not alerted purchasers that their food is contaminated, nor have they corrected their false advertising, nor have they recalled any of their defective products, nor have they disproven the allegations that they are engaging in food fraud.

191.    This 2019 release was not news to Defendants or the Council. At least by 2018, Defendants and the Council knew there was a systemic problem of contamination with baby food:

In 2018, [Consumer Report's] food safety team analyzed 50 nationally distributed packaged foods made for babies and toddlers, checking for cadmium, lead, mercury, and inorganic arsenic, the type most harmful to health. Those tests found that about two-thirds (68 percent) had worrisome levels of at least one heavy metal. Fifteen of the foods would pose potential health risks to a child regularly eating just one serving or less per day. Snacks and products containing rice and/or sweet potatoes were particularly likely to have high levels of heavy metals. [85]

## VIII.    CONGRESS DROPS A BOMBSHELL: THE REPORT

192.    Following years of dissemination of misinformation about what was contained in baby foods, the U.S. House of Representatives Subcommittee on Economic and Consumer Policy finally intervened and conducted their own investigation into what America's babies were ingesting, and the results were shocking.

193.    At the onset of their investigation, the Subcommittee reached out to the offender manufactures, requesting information about their processes and what they knew about the containments in their products fed to babies.

194.    Five of the seven Defendants herein responded, each making detailed, specific representations to Congress that have since been disputed. See Exhibits A-F attached hereto.

195.    The Report that followed, dropping on February 4, 2021, eviscerates Defendants for routinely and knowingly producing products full of dangerous toxins, namely heavy metals, and perpetually misleading consumers who think what they are buying for their children is safe and healthy.

196.    The Report specifically noted the various ways in which Defendants routinely, similarly acted, grossly negligent of how a manufacturer should act in producing baby food:

---

[85] Consumer Reports Advocacy, *CR Renews call for FDA and manufacturers to take action*, Feb. 4, 2021, https://advocacy.consumerreports.org/press_release/cr-renews-call-for-fda-and-manufacturers-to-take-action-to-keep-infants-and-children-safe-from-heavy-metals-in-foods/

a.  All sold baby food with dangerously high levels of lead,[86]

b.  All sold baby food with dangerously high levels of arsenic,[87]

c.  All sold baby food with dangerously high levels of cadmium,[88]

d.  All four of the Defendants that cooperated with Congress set their internal standards for presence of toxins at dangerously high levels but then sold products that exceeded those levels,[89]

e.  Three of the four Defendants that cooperated with Congress did not even test for mercury,[90]

f.  Three of the four Defendants that cooperated with Congress only tested ingredients, not the final product for lead,[91]

197.   The Subcommittee ticked through each of the offenses by each of the Defendants, including the three that refused to cooperate, noting "The Subcommittee is greatly concerned that their lack of cooperation might be obscuring the presence of even higher levels of toxic heavy metals in their baby food products than their competitors' products."

198.   In sum, with respect to Defendant Beech-Nut, the Report notably found that it:

a.  Used ingredients that tested as high as 913.4 ppb arsenic;[92]

b.  "Routinely used" high-arsenic additives testing over 300 ppb;[93]

---

[86] The Report at 3.

[87] *Id.*

[88] *Id.*

[89] *Id.* at 33-42.

[90] *Id.* at 4.

[91] *Id.* at 22.

[92] *Id.* at 3.

[93] *Id.*

    c.   Used ingredients as high as 886.9 ppb lead;[94]

    d.   Used 105 ingredients testing over 20 ppb cadmium, some testing as high as 344.55 ppb;[95]

    e.   Does "not even test for mercury in baby food;"[96]

    f.   Only tested arsenic content in its ingredients, not its final product;[97]

    g.   Only tested lead content in its ingredients, not its final product;[98]

    h.   Sold eleven products that surpassed its own internal (already-too-high) cadmium limits.[99]

199.    When originally confronted with the inquiry about these products containing high levels of heavy metal, Beech-Nut's CEO doubled down:[100]

    a.   "We apply rigorous testing protocols and heavy metal testing standards which are continuously reviewed and strengthened."[101]

    b.   "…Through the following decades, this technology has improved, increasing in sensitivity and enhancing our ability to detect reliably the levels of heavy metals in

---

[94] *Id.*

[95] *Id.*

[96] *Id.* at 33.

[97] *Id.* at 17.

[98] *Id.* at 22.

[99] *Id.* at 38-39.

[100] Letter from the President and CEO of Beech-Nut Nutrition Company to Chairman Raja Krishnamoorthi, Subcommittee on Economic and Consumer Policy, Committee on Oversight and Reform (Dec. 6, 2019) https://oversight.house.gov/sites/democrats.oversight.house.gov/files/6_0.pdf) *See* Exh. B.

[101] *Id.*

foods, which has enabled us to lower the allowable levels under our internal

standards."[102]

    c. Beech-Nut's explanation of why it accepted products over its own internal limits

was that it did so "rarely", and the ingredients were "generally restricted to a 20%

variance of BNN's allowable limits…."[103]

200. Since The Report's release, Beech-Nut has not been vocal, but has assured parents

and consumers that its products are "safe and nutritious…"[104]

201. With respect to Defendant Campbell/Plum Organics, the Report notably found:

    a. "Campbell refused to produce its testing standards and specific testing results to the

Subcommittee."[105]

    b. "Campbell has hidden its policies and the actual level of toxic heavy metals in its

products."[106]

    c. "…refused to cooperate with the Subcommittee's investigation"[107]

    d. "The Subcommittee is greatly concerned that their lack of cooperation might

obscure the presence of even higher levels of toxic heavy metals in their baby food

products, compared to their competitors' products."[108]

---

[102] *Id.* at 2.

[103] *Id.*

[104] Elaine Watson, *Baby food brands defend protocols as congressional report alleges 'highly dangerous' levels of heavy metals in infant foods; expect lawsuits, stays attorney,* FOOD NAVIGATOR, Feb. 5, 2021.

[105] The Report at 44.

[106] *Id.*

[107] *Id.* at 2.

[108] *Id.* at 5.

202.    Defendant Campbell continues to obfuscate the truth from Plaintiffs, parents and consumers, claiming to Food Navigator (following the release of the report): "Campbell has conducted testing on every Plum Organics product on the market to ensure none exceed acceptable levels of arsenic, lead, cadmium, or mercury"[109]—without actually clarifying what "acceptable levels" are or providing any substantive information about heavy metals in their food.

203.    With respect to Defendant Gerber, the Report notably found it:

    a.    Routinely used flour with over 90 ppb inorganic arsenic.[110]

    b.    Uses ingredients testing as high as 48 ppb lead;[111]

    c.    "…[R]arely tests for mercury in its baby food;"[112]

    d.    Incorporated in its products juice concentrate with high arsenic levels;[113]

    e.    It does not test all its ingredients for cadmium. Of those it does test, it accepts ingredients with high levels of cadmium.[114]

204.    Gerber continues to maintain that its products are perfectly fine, responding to the Report in opaque terms, boasting that it employs safety standards for food testing "among the strictest in not just the US, but the world."[115]

---

[109] Elaine Watson, *Baby food brands defend protocols as congressional report alleges 'highly dangerous' levels of heavy metals in infant foods; expect lawsuits, stays attorney,* FOOD NAVIGATOR, Feb. 5, 2021.

[110] The Report at 19.

[111] *Id.* at 27.

[112] *Id.* at 33.

[113] *Id.* at 52.

[114] *Id.* at 32.

[115] Elaine Watson, *Baby food brands defend protocols as congressional report alleges 'highly dangerous' levels of heavy metals in infant foods; expect lawsuits, stays attorney,* FOOD NAVIGATOR, Feb. 5, 2021.

205.    With respect to Defendant Hain/Earth's Best Organic, the Report notably found that it:

    a.  Sells finished baby food products testing as high 129 ppb inorganic arsenic;[116]

    b.  Uses ingredients "containing as much as 352 ppb lead."[117]

    c.  Used 102 ingredients in its baby food that tested over 20 ppb cadmium, with some testing up to 260 ppb;[118]

    d.  Does "not even test for mercury in baby food;"[119]

    e.  Used four ingredient products that surpassed its internal toxic heavy metal limits.[120]

    f.  "Despite having dangerously high levels of toxic heavy metals, Hain approved the use of this vitamin pre-mix based on a "theoretical" calculation of toxic heavy metals in the final good."[121]

    g.  Hain's vitamin pre-mix "contained 352 ppb lead, a matter not even addressed in the FDA presentation"[122]

206.    And most incredibly, the Report uncovered that on August 1, 2019, the FDA received a secret slide presentation from Hain (Earth's Best Organic), which revealed their

---

[116] The Report at 54.

[117] *Id.* at 56.

[118] *Id.* at 3.

[119] *Id.* at 4.

[120] *Id.* at 41.

[121] *Id.*

[122] *Id.* at 56.

corporate policies to test only ingredients, not final products, underrepresent the levels of toxic heavy metals in baby foods.[123]

207.    Labeled as "Confidential Business Information", Hain presented the FDA with a PowerPoint presentation, noting higher levels of arsenic in all finished foods tested for the presentation than were reflected in tests of individual raw ingredients. See Exh. J.

208.    The presentation contained information about the company only testing individual ingredients and not final products that hit the shelves, "[t]his revelation means that every single finished good containing brown rice had more arsenic than the company's estimates, which were based on testing the raw ingredients."[124]

209.    Parents and consumers were kept in the dark about the information Hain presented to the FDA a year and a half ago—information that should have invigorated the FDA to act to implement rigorous baby food testing standards.

210.    Upon this disclosure coming to light in the Report, Defendant Hain has claimed that the Report mischaracterized the meeting, and it was actually a meeting to "discuss how to better refine [] standards and practices" and "Like any food producer, we meet with regulatory and oversight agencies to refine and update our policies and procedures to ensure the safety of our products…. [f]ollowing the meeting, we took several steps to reduce the levels of heavy metals in our finished products…"[125]

---

[123] *Id.* at 5, 53-56.

[124] *Id.* at 53.

[125] Elaine Watson, *Baby food brands defend protocols as congressional report alleges 'highly dangerous' levels of heavy metals in infant foods; expect lawsuits, stays attorney,* FOOD NAVIGATOR, Feb. 5, 2021

211.    Defendant Hain further claims "Nothing is more important to Earth's Best than the trust and confidence of parents that our organic products provide safe nutrition for healthy babies."[126]

212.    With respect to Defendant Nurture/Happy BABY, the Report notably found that it:

a.    Sells ALL products tested, "regardless of how much toxic heavy metal the baby food contained";[127]

b.    Sells baby foods that tested as high as 180 ppb inorganic arsenic;[128]

c.    "Nurture sold products that tested as high as 641 ppb lead—over six times higher than its internal limit of 100 ppb lead."[129]

d.    Almost 20 percent of baby food products they tested contained over 10 ppb lead;[130]

e.    Sixty five percent of their finished baby food products contained more than 5 ppb cadmium;[131]

f.    Sells baby food products containing as much as 10 ppb mercury.[132]

213.    Most incredibly though, Nurture produced inaccurate data in the course of the investigation to portray itself in a more favorable light, according to Congress.

214.    The Subcommittee didn't take this lightly. "Further, **Nurture appears to have misled the Subcommittee about its testing standards.** As seen from Nurture's goal thresholds

---

[126]    Hain Press Release. Feb. 4, 2021. https://ir.hain.com/news-releases/news-release-details/statement-behalf-earths-best-organic-response-congressional (last visited Feb. 15, 2021)

[127]    The Report at 4.

[128]    *Id.* at 13.

[129]    *Id.* at 22.

[130]    *Id.* at 3.

[131]    *Id.* at 4.

[132]    *Id.*

pictured below, Nurture conveyed to the Subcommittee that after January of 2019, it had a goal threshold of 50 ppb for lead in all of its baby food products—infant formula, cereals, and wet foods. However, in the test results that Nurture provided to this Subcommittee, it was still using 100 ppb as an internal guideline after January 2019."[133]

This image is from Nurture's December 18, 2019, response to the Subcommittee, stating that after January of 2019, its lead threshold was 50 ppb in all baby food products:[91]

All of our specific goal thresholds for the referenced contaminants* are set forth in the chart below.

| Product Type | Contaminant | Analytical Matrix | Goal Threshold | Unit |
|---|---|---|---|---|
| Infant Formula | Cadmium | As Sold | 10 | ppb |
| Infant Formula | Inorganic Arsenic | As Sold | 75 | ppb |
| Infant Formula | Lead | As Sold | 50 | ppb |
| Cereals | Cadmium | As Consumed | 50 | ppb |
| Cereals with <75% Rice | Inorganic Arsenic | As Sold | 100 | ppb |
| Cereals with >75% Rice | Inorganic Arsenic | As Sold | 115 | ppb |
| Cereals | Lead | As Consumed | 50* | ppb |
| Cereals | Mercury | As Consumed | 10 | ppb |
| Wet Foods | Cadmium | As Consumed | 50 | ppb |
| Wet Foods | Inorganic Arsenic | As Sold | 100 | ppb |
| Wet Foods | Lead | As Consumed | 50* | ppb |
| Wet Foods | Mercury | As Consumed | 10 | ppb |

*Threshold lowered from 100ppb to 50ppb in January, 2019.

However, the chart below appears to show that after the date Nurture claims to have moved to a 50 ppb lead standard—January 2019—Nurture was still using a "Goal Threshold" of 100 ppb for 53 baby food products. The fact that Nurture appears to have continued using a higher standard up to nine months after it claimed to the Subcommittee to have lowered the threshold casts serious doubt on Nurture's candor in this matter.

215.    After this scathing rebuke, Defendant Nurture simply followed suit with its other co-Defendants, releasing an exhaustive response on its website and denying wrongdoing, "The Congressional report brings to light a very important issue on the need for continued improvement in the way we work with our land and the standards that are set in the US across many foods. But

---

[133] *Id.* at 35.

as a brand that prides itself on a data-driven approach to quality, safety, and nutrition overall, we are deeply disappointed at the select usage of data we provided back in 2019, and the many inaccuracies in the report…. The report also mentioned two data points for lead—641 ppb and 580 ppb. These data points are outliers…"[134]

216.     With respect to Defendant North Castle/Sprout Organic, the Report notably found:

a.     Independent testing of Sprout Organic Foods has "confirmed that their baby foods contain concerning levels of toxic heavy metals."[135]

b.     "Did not respond to the Subcommittee at all," despite "numerous attempts;" "never responded or made contact with the Subcommittee."[136]

c.     "Sprout's failure to respond raises serious concerns about the presence of toxic heavy metals in its baby foods, as even limited independent testing has revealed the presence of toxic heavy metals in its products."[137]

217.     From Sprout, the silence has been deafening, and they are yet to release any statement, comment or defense of their deplorable practices.

218.     With respect to Defendant Walmart/Parent's Choice, the Report notably found:

a.     "Walmart… refused to cooperate with the Subcommittee's investigation."[138]

---

[134]Happy Family Organics, Quality & Safety of our Products, https://www.happyfamilyorganics.com/quality-and-safety-of-our-products/ (last visited Feb. 15, 2021)

[135] The Report at 46.

[136] *Id.*

[137] *Id.*

[138] *Id.* at 2.

b. Independent testing confirms their baby foods contain "concerning levels of toxic heavy metals."[139]

c. "Walmart refused to produce any documents showing its internal testing policies, its testing results, or how Walmart treats ingredients and/or products that surpass any internal standards."[140]

d. "Walmart's evasion is concerning, as even limited independent testing has revealed the presence of toxic heavy metals in its baby food."[141]

219. Despite Congress's representations that Defendant Walmart refused participation, Walmart claims otherwise, saying they "provided information to the subcommittee nearly a year ago and invited more dialogue on this important issue but never received any additional inquiries[.]"[142]

220. What was found in the Report and what was determined based on some Defendants' lack of cooperation was that babies across the Country (and the world) are perpetually eating and ingesting food that is produced containing high levels of toxins and heavy metals and Defendants knowingly sold these products to unsuspecting families, with little regard for the health and wellbeing of these innocent children. *See* the Report.

221. Most tragically, the potentially tragic effects on children who ate food produced by Defendants and containing these heavy metals might not be discovered for years to come.

---

[139] *Id.* at 43.

[140] *Id.*

[141] *Id.*

[142] Elaine Watson, *Baby food brands defend protocols as congressional report alleges 'highly dangerous' levels of heavy metals in infant foods; expect lawsuits, stays attorney,* FOOD NAVIGATOR, Feb. 5, 2021

222.    Defendants' actions have likely caused irreparable harm to hundreds of thousands of families across the nation.

223.    Further, the report's findings confirmed that Plaintiffs and members of the putative class have suffered significant economic damages, to the tune of billions of dollars[143], because they paid for healthy, nutritious baby food for their children, devoid of containments, but received foods containing high levels of heavy metals.

224.    Plaintiffs and parents who purchased these products never could have imagined what was contained in them—they relied on Defendants' representations of the ingredients and relentless use of superlatives to describe the food—and paid for the products based on these representations.

225.    Because of the presence of these toxic heavy metals, the sale of these products should never have occurred, and but-for Defendants' abhorrent practices in producing and selling this baby food, Plaintiffs would not have been injured.

## IX.    CLASS ACTION ALLEGATIONS

226.    Plaintiffs bring this action individually and on behalf of the following Classes pursuant to Rules 23(a) and 23(b)(2) and (3) of the Federal Rules of Civil Procedure:

RICO Class for all persons with standing to prosecute Count I:

All persons in the United States who, from January 1, 2019, to the present, purchased foods for babies, toddlers or children manufactured by Defendants Beech-Nut, Gerber, Hain or Nurture, for household or business use, and not for resale (the "State Law Class").

State Law Class for all persons with standing to prosecute Counts II - IX:

All persons in the United States who, from February 19, 2018, to the present, purchased foods for babies, toddlers or children manufactured by any of the seven Defendants named herein for household or business use, and not for resale (the "State Law Class").

---

[143] Emma Bedford, *U.S. baby food market –statistics & facts*, Statista. Nov. 20, 2020

227. Excluded from the Classes are the Defendants, any parent companies, subsidiaries, and/or affiliates, officers, directors, legal representatives, employees, co-conspirators, all governmental entities, and any judge, justice, or judicial officer presiding over this matter.

228. This action is brought and may be properly maintained as a class action. There is a well-defined community of interests in this litigation and the members of the Classes are easily ascertainable. Purchasers of these products can identify their purchases through receipts, store rewards programs, and their own testimony.

229. The members in the proposed Classes are so numerous that individual joinder of all members is impracticable, and the disposition of the claims of the members of all Class members in a single action will provide substantial benefits to the parties and Court.

230. Questions of law and fact common to Plaintiffs and the Classes include, but are not limited to, the following:

   a. whether Defendants owed a duty of care to Plaintiffs and the Classes;

   b. whether Defendants knew or should have known that the baby foods contained, or may contain, heavy metals;

   c. whether Defendants wrongfully represented and continue to represent that the baby foods are natural and safe for human infant consumption;

   d. whether Defendants wrongfully represented and continue to represent that their baby foods are healthy, superior quality, nutritious and safe for consumption;

   e. whether Defendants wrongfully represented and continue to represent that these products are natural;

f.   whether Defendants wrongfully represented and continue to represent that the manufacturing of baby foods are subjected to rigorous standards, including testing for heavy metals and government regulation;

g.   whether Defendants wrongfully failed to disclose that their baby foods contained, or may contain, heavy metals;

h.   whether Defendants' representations in advertising, warranties, packaging, and/or labeling are false, deceptive, and misleading;

i.   whether those representations are likely to deceive a reasonable consumer;

j.   whether a reasonable consumer would consider the presence, or risk of, heavy metals as a material fact in purchasing baby food;

k.   whether Defendants had knowledge that those representations were false, deceptive, and misleading;

l.   whether Defendants continue to disseminate those representations despite knowledge that the representations are false, deceptive, and misleading;

m.  whether a representation that a product is healthy, superior quality, nutritious and safe for consumption and does not contain arsenic, mercury, cadmium, lead and/or other heavy metals is material to a reasonable consumer;

n.   whether Defendants' representations and descriptions on the labeling of their baby foods are likely to mislead, deceive, confuse, or confound consumers acting reasonably;

o.   whether Defendants violated 18 U.S.C. § 1964(a);

p.   whether Defendants violated the laws of the State of Kansas;

q.   whether Defendants violated the laws of other states;

    r.   whether Defendants breached express warranties;

    s.   whether Defendants breached implied warranties;

    t.   whether Defendants made negligent and/or fraudulent misrepresentations and/or omissions;

    u.   whether Plaintiffs and the members of the Class are entitled to actual, statutory, and punitive damages; and

    v.   whether Plaintiffs and members of the Class are entitled to declaratory and injunctive relief.

231.   Defendants engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs individually and on behalf of Class members. Identical statutory violations and business practices and harms are involved. Individual questions, if any, are not prevalent in comparison to the numerous common questions that dominate this action.

232.   Plaintiffs' claims are typical of those of the members of the Classes in that they are based on the same underlying facts, events, and circumstances relating to Defendants' conduct.

233.   Plaintiffs will fairly and adequately represent and protect the interests of the Classes, have no interests incompatible with the interests of the Classes, and have retained counsel competent and experienced in class action, consumer protection, and false advertising litigation.

234.   Class treatment is superior to other options for resolution of the controversy because the relief sought for each member of the Classes is small such that, absent representative litigation, it would be infeasible for members of the Classes to redress the wrongs done to them.

235.   Questions of law and fact common to the Classes predominate over any questions affecting only individual members of the Class.

236.   As a result of the foregoing, class treatment is appropriate.

## X.    CLAIMS

**COUNT I:** **Violation of The Racketeer Influenced and Corrupt Organizations Act (Civil RICO) under 18 U.S.C. § 1962(c) and (d) v. Beech-Nut Nutrition Company, Gerber Products Company, Hain Celestial Group, Nurture, Inc.**

237.    Plaintiffs bring Count I on behalf of the Class against Defendants Beech-Nut, Gerber, Hain, Nurture.

238.    Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

239.    Plaintiff Johnson alleges this claim against Defendants Beech-Nut, Gerber, Hain, and Nurture. Plaintiff Johnston alleges this claim against Defendants Beech-Nut and Gerber. Plaintiff Bucci alleges this claim against Defendants Beech-Nut, Gerber, Hain, Nurture. Plaintiff Gross alleges this claim against Defendants Hain, Gerber, Nurture.  Plaintiff McCartin alleges this claim against Defendants Gerber, Nurture, and Beech-Nut. Plaintiff Lake alleges this claim against Defendants Gerber, Nurture, and Hain. Plaintiff Nemmers alleges this claim against Defendants Beech-Nut, Nurture, Hain, and Gerber. Plaintiff Scott alleges this claim against Defendants Gerber and Nurture. Plaintiff Tankard alleges this claim against Gerber and Nurture. Plaintiff VanDyke alleges this claim against Defendants Hain, Nurture, and Gerber.

240.    At all relevant times, Defendants have been "persons" under 18 U.S.C. § 1961(3).

241.    Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c).

242.    Section 1962(d) makes it unlawful for "any person to conspire to violate", among other provisions, Section 1962(c). See 18 U.S.C. § 1962(d).

243.     Defendants are all participants in the multi-billion-dollar baby food industry. Finding it difficult to achieve their ambitious goals lawfully and to outsell their competitors by playing by the rules, Defendants resorted to cheating through a scheme to defraud that included false representations, fraud by omission, and fraud by half-truth, among other forms.

244.     Defendants knew that American parents and purchasers are closely focused on the ingredients in baby food. They designed marketing and advertising campaigns around food safety and purity. The whole time they did so, they knew their products were not as advertised—that the products were contaminated (not pure), included foreign substances (not natural), and were dangerous to highly vulnerable babies (not safe).

245.     This RICO claim is for the economic damages that resulted from this interstate, nationwide, coordinated fraud. It does seek to recovery for personal injuries nor does it rely upon any personal injuries occurring. Instead, the baby food that was sold was "essentially worthless" because it did not contain the very essence of what was advertised. Parents and purchasers bought this baby food precisely because it was natural, pure, and safe—thus, because it was not, the very purpose of these purchases was fraudulently induced.

246.     Worse, the Defendants have prolonged their fraud by covering up and denying their underlying fraud. To this day, they have not recalled the contaminated products and are using the pretext of the Baby Food Council to avoid taking responsibility for their fraud.

247.     Consumers and purchasers are not highly educated on food manufacturing or processing and lack any ability to uncover the fraud that is occurring. Defendants aggravated this information asymmetry by using the Baby Food Council to further obscure their fraud and to falsely suggest they are committed to baby food safety.

**A.     The Baby Food Council Is Infiltrated and Used As An Enterprise For Fraud**

248.    At all relevant times, the four Defendants each engaged in food fraud using the Baby Food Council ("Baby Food Council" or "BFC") as an enterprise.

249.    The BFC, as an enterprise, has existed since January 2019, according to its website. Discovery is needed to confirm when it was actually created, who created it, how Defendants worked together, the financial payments that were made, the finances of the entity, and so forth. These documents and records are not publicly available and are kept confidential by Defendants, the Council, and the members of the Council.

250.    Each Defendant infiltrated and used the BFC as a vessel for fraud so that each Defendant could sell contaminated baby food products to purchasers without incurring the expense and time required to properly manufacture and process these foods.

251.    And once the American media uncovered the massive food fraud scheme that had been ongoing since January 2019, each Defendant hid behind its membership and status in the BFC as a decoy and shield. Defendants falsely claimed the Baby Food Council membership was proof they were committed to baby safety and health and best practices.

252.    This, too, was false and misleading because the BFC has not done anything to help American babies and to date has been kept dormant so that Defendants can use it to avoid liability. As set forth above, the Council has taken no activity in the 25 months since it was created, and it is a shell entity that has only been used to cover up the food fraud committed by Defendants.

253.    The Baby Food Council has also served as an anchor for Defendants to coordinate, work together, and unify their cover-up and concealment of their food fraud, coordinate and synchronize their fraudulent marketing and sales strategy, and manufacturing processes. Without the Baby Food Council, each Defendant would be exposed and forced to defend its food fraud on its own. With the Baby Food Council, Defendants are all able to band

together, point to each other's commitment, and defraud as a united group. This, too, confirms the Baby Food Council is an essential part of each Defendant's scheme to defraud Plaintiffs and the Class.

254.    By using the Baby Food Council website to (1) knowingly misrepresent that contaminated baby food is "natural" and (2) intentionally omit mercury as a heavy metal that should be tested and excluded from baby food, each Defendant has further integrated the Baby Food Council into its scheme to defraud Plaintiffs and the Class.

255.    The Baby Food Council might or might not be a participant in the schemes to defraud, and discovery is required to determine its involvement.

256.    At a minimum, the Baby Food Council is an enterprise and each Defendants has operated or participated, directly or indirectly, in the affairs of the Baby Food Council through a pattern of racketeering activity—i.e., wire fraud, mail fraud, and the corruption of an official proceeding before Congress.

257.    Indeed, Defendants had no legitimate or lawful use for becoming members of the Baby Food Council other than to use it to commit fraud. They engaged in repeated acts of wire fraud and mail fraud, and they sought to cover up and explain away this fraud using their membership in the Baby Food Council and statements it made as an alibi for their food fraud.

258.    The Baby Food Council's inactivity and failure to engage in any substantive activity further confirms it has been infiltrated by Defendants and used by them as a vessel for fraud.

259.    If the Baby Food Council were a legitimate organization actually committed to baby food health and safety, it would have taken active steps to combat baby food contamination

and speak out against the widely established, industry-wide baby food fraud that was exposed in February 2021. But the Baby Food Council said and did nothing.

260.    It is necessary to hold Defendants accountable for their racketeering so that the Baby Food Council can be cleansed of these bad actors. Freed from Defendants' fraud and nefarious influences, the Baby Food Council can actually take steps to help combat baby food contamination.

261.    At all relevant times, the Baby Food Council had an existence separate and distinct from each of the Defendants and was separate and distinct from the pattern of racketeering in which Defendants engaged.

262.    Each of the Defendants made its membership in the Baby Food Council a central part of their scheme to defraud. Defendants ordinarily are competitors and should be competitors who compete for market share; they used the Baby Food Council as a mechanism to conspire and work together to deflect and deny their collective food fraud.

263.    Likewise, baby food has been sold for decades in America. The BFC was created only in January 2019 because Defendants knew they were running out of time to conceal their fraud—they became desperate to create a new entity (BFC) to help deflect and deny their fraud was occurring. The timing of the BFC's creation in January 2019 further confirms it was created for the purpose of facilitating the ongoing food fraud.

264.    Through their collective membership in the BFC, Defendants worked side by side (rather than in competition) with the common purpose of furthering the illegal baby food fraud scheme and their common purposes of blocking food standards from being adopted and preventing purchasers and the American public from uncovering the massive food fraud scheme they were engaged in.

265.    Defendants made sure to include legitimate entities, like Cornell University, as members of the Baby Food Council and made sure the website for the Baby Food Council is hosted on Cornell's Food Science Department in order to lend a false aurora of legitimacy.

266.    The ordinary business of Defendants is to engage in the manufacture and sales of baby food products. It is not part of their routine business to engage in acts of mail and wire fraud to mislead purchasers about the contents of their products and their steps to combat food contamination.

267.    Defendants have also made mail and wire fraud part of the ordinary business activities by routinely selling contaminated food products and engaging in advertising and marketing that is knowingly and willfully false and fraud by omission or fraud by half-truth.

268.    Each Defendant has a separate existence separate and apart from the enterprise, including distinct legal statuses, different offices and roles, bank accounts, officers, directors, employees, individual personhood, reporting requirements, and financial statements.

269.    Indeed, the Baby Food Council website is a separate website that identifies the Baby Food Council as an independent entity to which each Defendant is a member. Defendants have used the independent status of the Baby Food Council as an integral part of their fraud schemes—suggesting that they are members of an independent, legitimate third-party entity that is working to combat baby food fraud contamination.

270.    The Baby Food Council might be dormant and not engaging in real activity, but Defendants have conveyed to purchasers, Congress, and the American public the opposite and are bound by those representations. By publicly touting their membership in the Baby Food Council, Defendants have committed to the Baby Food Council being a real entity engaged in real activity.

C.    **The Pattern of Racketeering: Mail Fraud and Wire Fraud and Corruption of an Official Proceeding**

271.    To carry out their schemes to defraud, Defendants knowingly participated, directly or indirectly, and conducted the affairs of the BFC through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) and 1962(c).

272.    From at least 2019, to the present, Defendants have worked to execute a scheme to defraud by infiltrating and using the Baby Food Council as a vessel for fraud. These entities all participated directly or indirectly in a scheme to (1) coordinate the suppression of information revealing the widespread contamination of baby food during manufacturing; (2) delay the adoption of governmental standards for baby food manufacturers; (3) falsely suggest that contamination of baby food products is "natural"; (4) falsely suggest that they were committed to developing standards, when in fact the Baby Food Council has done nothing to solve this problem; and (5) cover-up and conceal their ongoing food fraud by touting their active involvement in the Baby Food Council as proof of their commitment to baby food safety (when in fact the opposite is proven true).

273.    Contrary to public statements made by Defendants, the Baby Food Council was designed to falsely lull purchasers of contaminated baby food (Plaintiffs and the Class) into believing that food companies are actively working to fix the food fraud that is occurring.

274.    The Baby Food Council was done nothing other than serve as a shiny distraction. Despite being formed in January 2019, the Baby Food Council has done nothing substantive to address the lack of food standards or to regulate its members. The Council has not issued any demands for product recalls, nor has it assisted its members or the public with anything. It has sat dormant, as it was intended, merely to deflect attention and serve as a false hope that Defendants are doing something, when in fact they are not.

275.    The four food companies that joined the Baby Food Council joined because they knew their scheme to defraud would soon be exposed, and they wanted to have a handy diversion ready to convince purchasers and the government that they were actively addressing the concerns.

276.    This was a fraudulent pretext—these companies have known for several years that their products are contaminated, and they did nothing to stop these problems—either in January 2019 or any time before.

277.    When Congress began its inquiry into allegations that baby food was contaminated with heavy metals and sought information from Defendants, they were quickly met with Defendants' proclamations that membership in the Baby Food Council meant they were dedicated to fixing the problem. *See* Exhibits B, C, D and E.

a.    From Defendant Beech-Nut, December 6, 2019:

> In October of 2018 we encouraged Cornell University to establish a coalition of academia, baby food companies, governmental and non-governmental organizations("NGO"), including Health Babies Bright Futures, to conduct research and work to achieve a long-term reduction of heavy metals in the baby food supply chain.
>
> Shortly thereafter, The Baby Food Council (BFC) was formed in January of 2019. Its top priority is to reduce heavy metals in the products manufactured and marketed by the member companies using best-in-class management practices. The council members meet monthly with our non-governmental organization and regulatory agencies to discuss past actions and set the agenda for future research and testing.

b.  From Defendant Gerber, December 19, 2019:

In addition to the Nestlé internal programs and procedures to manage contaminants described above, Gerber is also a founding member of the Baby Food Council, which is comprised of leading companies and academic, government, and NGO partners and advisors. The Council was created in January of 2019 with the objective of reducing heavy metals in the products manufactured by the member companies to as low as reasonably achievable using best-in-class management practices.

Early efforts of the Council have focused on identifying those foods and ingredients with the highest potential to contribute to heavy metal exposure in young children. We will also be identifying and evaluating best practices that can be used to further lower heavy metal levels in these foods. Recognizing that heavy metals are widely present in the environment and can get into food, this work will initially focus on the impact of the environment and growing conditions but will also extend to other aspects of the supply chain including handling and processing. Our efforts with the Council represent our commitment to the safety of the baby food category.

c.  From Defendant Hain, December 11, 2019:

Hain is a member of the Baby Food Council ("Council"), a group of companies organized by Cornell University and the Environmental Defense Fund. The Council's mission is supported by the U.S. Department of Agriculture, the Food and Drug Administration ("FDA"), and other stakeholders, including Healthy Babies Bright Futures, the organization that authored the report that prompted the Subcommittee's request. Like all of the Council's member companies, Hain is committed to producing safe, nutritious, high-quality baby food products. Moreover, Hain supports the FDA finalizing guidance limiting inorganic arsenic in baby food products, and it supports the development of additional guidance limits as supported by the scientific evidence.

Heavy metals occur naturally in the environment, but their prevalence varies widely depending on food types and sources. Hain supports the Council's efforts to identify foods and ingredients with the highest potential to contribute to heavy metal exposure in children, as well as its efforts to develop effective mitigation strategies. Hain further supports the Council's decision to focus initially on environmental factors, including growing conditions and farming techniques, understanding that the Council will also assess ways to improve manufacturing and handling processes.

d.  From Defendant Nurture, December 18. 2019:

Furthermore, we believe our approach is better than, or at least consistent with, that taken by others in our industry. Indeed, we joined the Baby Food Council, which was created this year with the objective to reduce heavy metals in baby food products as low as reasonably achievable using best-in-class management practices. This Council includes the leading baby food manufacturers as well as the Environmental Defense Fund (EDF).[7]

278.     Defendants sent these fraudulent statements, via mail and e-mail, to members of the United States Congress.

279.     And once the February 2021 congressional report was released, Defendants stampeded to tout their commitment to child safety as proven by their membership in the Baby Food Council.

280.     For example, Gerber stated on its website on or around Feb. 4, 2021:

"As stated in our 2019 response to the Congressional Inquiry, we take many steps to minimise their presence. We prioritise growing locations based on climate and soil composition. We approve fields before crops are planted based on soil testing," the statement read.

It continued: "As a member of the Baby Food Council, we have been working together with other industry members, the Environmental Defense Fund, Healthy Babies Bright Futures and Cornell University in the identification of best agricultural practices and creating a voluntary industry standard to reduce heavy metal levels in baby foods to the lowest levels possible."

281.     Gerber further stated:

Gerber added: "The standards we have in place for the safety and quality of our baby foods are industry-leading, and among the strictest in not just the US, but the world. We meet the standards of the FDA, but we don't stop there. We meet or exceed all existing government requirements, and where they don't currently exist, we have established our own high standards based on the latest food-safety guidance. Gerber foods receive thorough oversight at all levels of the growing and the production process."

282.     While actively selling their products in January 2019 to present, Defendants kept secret their knowledge of the massive contamination in their products. They committed fraud by omission and fraud by half-truth by advertising their products from January 2019 to present as safe, nutritious, pure, and natural—despite knowing that these representations were false and that their products were contaminated with several heavy metals.

283.     Now, in February 2021, when caught committing fraud, Defendants try to defend by claiming there are no standards, and they cannot be held accountable as a result. They advertised and made promises that were far higher and more demanding, and it is these promises

and representations that they are held to under the federal fraud laws. They cannot advertise and promise under one standard, and then defend and deflect under a much lower one.

284.    Their denial and deflection are a second stage of their ongoing scheme to defraud—it's the cover-up stage. Defendants knew all along that there are no food standards, but they did not disclose this when they advertised their products. Having chosen to advertise that their foods are pure, safe, natural, and held to the highest standards, it was a fraudulent omission or fraud by half-truth to only now claim there are no standards. This was not disclosed to purchasers at any time prior to February 4, 2021.

285.    According to Brian Ronholm, director of food policy at Consumer Reports, the recent uncovering of the food fraud scheme is "especially troubling" because Defendants "knew of the high levels of heavy metal contamination and still sold the products."[144]

286.    Defendants have engaged in acts of lulling as a cover-up and to continue their ongoing schemes to defraud, as evidenced by the statements alleged throughout this Complaint, and by way of further example:

287.    In a February 4, 2021, article in the Washington Post that was disseminated nationwide, Beech-Nut spoke directly to purchasers and "assured parents its baby food is 'safe and nutritious.'"[145] This statement was knowingly false and said to cover-up the crimes that Beech-Nut has committed. It effectively doubled-down on its ongoing food fraud and sought to convince purchasers and parents that they could continue to purchase and have their children consume unsafe food.

---

[144] Consumer Report, *CR renews call for FDA and manufacturers to take action to keep infants and children safe from heavy metals in foods*, Feb. 4, 2021.

[145] Dee-Ann Durbin, *Congressional report finds toxic metals in baby food brands*, WASH. POST, (Feb. 4, 2021)

288.    In a February 4, 2021 article in the Wall Street Journal that was widely disseminated, Gerber spoke directly to purchasers and stated that "all of its food meets its safety standards, which it says are among the strictest in the world."[146]

289.    In a February 4, 2021 press release that was widely disseminated and posted by Good Morning America[147] and other news outlets, Hain spoke directly to purchasers, stating "Nothing is more important to Earth's Best than the trust and confidence of parents that our organic products provide safe nutrition for healthy babies.  Our rigorous internal standards and testing procedures ensure Earth's Best products meet or exceed the current federal guidelines."[148]

290.    In a February 5, 2021 article in People that was widely disseminated, Nurture spoke directly to purchasers, "We can say with the utmost confidence that all Happy Family Organics products are safe for babies and toddlers to enjoy, and we are proud to have best-in-class testing protocols in our industry."[149]

291.    The predicate acts of racketeering (18 U.S.C. § 1961(1)) engaged in by Defendants include, but are not limited to:

    e.  Mail Fraud:  Defendants entities violated 18 U.S.C. § 1341 by engaging in an unlawful scheme to defraud involving false pretenses, misrepresentations,

---

[146] Annie Gasparro and Sharon Terlep. *Toxic Heavy Metals Found in Some Baby Food, Congressional Report Says*, WALLSTREET JOURNAL, (Feb. 4, 2021.)

[147] Katie Kindelan and Kelly McCarthy, *Some popular baby foods contain 'significant levels' of toxic heavy metals, report says,* GOOD MORNING AMERICA, Feb. 5, 2021. https://www.goodmorningamerica.com/wellness/story/popular-baby-foods-significant-levels-toxic-heavy-metals-75685913

[148] Hain Press Release, Feb. 4, 2021. https://ir.hain.com/news-releases/news-release-details/statement-behalf-earths-best-organic-response-congressional

[149] Benjamin VanHoose, *Investigation Finds Baby Food Products 'Tainted with Significant Levels of Toxic Heavy Metals', People,* Feb. 5, 2021, https://people.com/parents/baby-food-found-tainted-dangerous-levels-toxic-heavy-metals-congressional-investigation-report/

promises, half-truths, and omissions. In furtherance of this scheme, Defendants used the mails:

    i.  Defendants shipped, or caused to ship, via interstate mail the baby food products that were purchased by Plaintiffs and the Class.

    ii.  Defendants used the mails to send letters to the U.S. House of Representatives in December 2019 to perpetuate their false pretenses, misrepresentations, promises, half-truths, and omissions;

    iii.  Defendants used the mails in furtherance of their scheme to defraud and, in fact, could not have accomplished their scheme to defraud without using the mails to ship their products to all fifty states.

    iv.  Further discovery will likely uncover additional uses of the mail.

f.  Wire Fraud:  Defendants violated 18 U.S.C. § 1343 by engaging in an unlawful scheme to defraud involving false pretenses, misrepresentations, promises, half-truths, and omissions. In furtherance of this scheme, Defendants used the interstate wires, including the Internet, email, and use of the telephone across state lines.

    v.  Defendants have engaged in extensive, nationwide (interstate) advertising campaigns using Facebook, email, and the Internet to reach consumers in all 50 states. For example:

        1.  Plaintiff Jenna Johnson recalls seeing Defendants' products advertised to her online before purchasing them, "When you Google baby foods to try which are the best, you read, organic, natural, healthy, and you hope to get that.   You see organic on the label and pay a little more in hopes it is better for your baby.  A parent should

not have to deep dive and do extensive research to see if a jar of baby food they buy at a reputable store is going to be safe for their child."

2. Similarly, Plaintiff Courtney Nemmers went to the web to find the best products for her children: "I read labels and product websites on many occasions. One specific example was the Beech-Nut Organic Sweet Potatoes and PLUM Organics "Just Sweet Potatoes" - The labels and the websites stated organic sweet potatoes and water were the only ingredients in the pouches and jars. Never would I have imagined an organic pouch stating only organic sweet potatoes had toxic metals inside."

3. All Plaintiffs herein had similar experiences.

vi. Defendants used the interstate wires to communicate with one another via email or telephone regarding the Baby Food Council.

vii. The Baby Food Council website was created on or around January 2019 when it was created. This website uses the interstate wires to suggest a legitimate entity that is engaged in meaningful activity.

viii. Defendants used email and interstate wires to send letters to the U.S. House of Representatives in December 2019 to perpetuate their false pretenses, misrepresentations, promises, half-truths, and omissions.

ix. Defendants used email and interstate wires to issue press releases, set forth above, on or around February 4, 2021, to deny the food fraud that Congress uncovered and to lull their victims into believing this fraud had stopped.

Without use of the interstate wires, Defendants could not have communicated with Plaintiffs or the class either when marketing and advertising their products or when denying and covering up their scheme to defraud.

x.  Defendants have coordinated their cover-up schemes with each other and the Baby Food Council throughout February 2021.

xi. Because the emails and telephone calls of Defendants are in their exclusive possession and are not publicly available, discovery is needed for Plaintiffs to plead the exact dates and names of the persons who made these communications.

292.    This pattern of racketeering is open-ended and remains ongoing to this day. Only by pursuing this lawsuit and financially punishing Defendants will the pattern of racketeering at issue here finally cease. Defendants to this day deny their ongoing food fraud and have not issued a recall of the dangerous baby food products that they have sold and continue to sell in interstate commerce in all 50 states.

293.    The predicate acts are all related because they were all done in furtherance of the same overall goal and common purpose of the RICO enterprise: to allow Defendants to sell baby food without engaging in safe (and more costly) food production, manufacturing, and processing. The predicate acts allowed Defendants to cut corners and save millions of dollars, which translated into bigger bonuses for their executives, higher stock prices, and more dividends and distributions for their companies.

294.    The predicate acts have not ceased and will continue until this Court awards relief. By pursuing this RICO claim, Plaintiffs further hope to prompt criminal investigations and prosecutions by state and federal prosecutors.

**D.    Causation and Damages**

295.    There is a direct and straight line from the scheme to defraud to the damages suffered. Defendants marketed and advertised directly to the purchasers and parents in the Class. No other group was the focus of this advertising, and no other group can sue for this RICO claim.

296.    There are no intervening steps or causes that could have prevented or altered or even interfered with the fraud Defendants committed using the BFC as an enterprise.

297.    All Plaintiffs and members in the class purchased contaminated baby food in reasonable reliance upon the representations, statements, promises, and suggestions made in the advertisements and marketing campaigns of Defendants.

298.    But for the fraudulent marketing and advertising, and but for the fraudulent cover-up campaign, using the Baby Food Council as proof of Defendants' legitimacy, the purchasers and parents in the Class would not have purchased the contaminated products and would not continue to be purchasing them to this day.

299.    By reason of, and as a result of the conduct of Defendants, Plaintiff and Class members have been injured in their property (money is property) by purchasing "essentially worthless" products that failed to meet their essential and marketed/advertised purpose: being healthy, pure, natural, and safe.

300.    It was foreseeable—and, indeed, fully known—to Defendants that Plaintiffs and the Class members would not have purchased the contaminated food products had Defendants fully disclosed all known facts about the baby food products. Defendants purposefully omitted

material facts from their advertisements and made sure that Plaintiffs and the Class never were fully aware of all facts and circumstances.

301.    The violations of 18 U.S.C. § 1962(c) and (d) by Defendants have directly and proximately caused injuries and damages to Plaintiff and Class members, and Plaintiff and Class members are entitled to bring this action for three times their actual damages, as well as costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(a) and (c).

302.    If a Defendant is not guilty as a primary RICO violator under 1962(c), it is liable for conspiring to violate RICO by engaging in the same schemes to defraud set forth above.

### COUNT II: Breach of Express Warranty
### v. All Defendants

303.    Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

304.    Plaintiff Johnson alleges this claim against Defendants Beech-Nut, Campbell, Gerber, Hain, and Nurture. Plaintiff Johnston alleges this claim against Defendants Beech-Nut, Gerber, and Walmart. Plaintiff Bucci alleges this claim against Defendants Nurture, Beech-Nut, Campbell, Gerber, and Hain. Plaintiff Gross alleges this claim against Defendants Campbell, Hain, Gerber, Nurture, and North Castle.  Plaintiff McCartin alleges this claim against Defendants Campbell, Gerber, Nurture, and Beech-Nut. Plaintiff Lake alleges this claim against Defendants Campbell, Gerber, Nurture, and Hain. Plaintiff Nemmers alleges this claim against Defendants Beech-Nut, Campbell, Nurture, Hain, and Gerber. Plaintiff Scott alleges this claim against Defendants Gerber, Nurture and Campbell. Plaintiff Tankard alleges this claim against Gerber and Nurture. Plaintiff VanDyke alleges this claim against Defendants Hain, Campbell, Nurture, and Gerber.

305.    Defendants utilized false and deceptive product labels as well as advertising to promote, encourage, and urge the use, purchase, and utilization of these baby foods by representing the quality and safety to parents and purchasers, Plaintiffs, and the public in such a way as to induce their purchase or use.

306.    Defendants expressly warranted that their foods in a misleading manner, calling them, *inter alia*:

    a.   Organic;

    b.   Safe;

    c.   Natural;

    d.   Healthy;

    e.   "Pure;

    f.   "Real food"

307.    Through these representations, Defendants made express warranties that these foods would conform to the representations.  More specifically, Defendants represented that these foods, when ingested by babies and children in the manner foreseen by Defendants, were safe and effective, that these foods were safe and effective for use by individuals such as Plaintiffs, for feeding their children.

308.    Defendants represented that their products only contained the ingredients disclosed on the label. These specific misrepresentations went beyond mere puffery as they were printed on the very product and in the product labeling.

309.    The representations, as set forth above, contained or constituted affirmations of fact  or promises made by the seller to the buyer which related to the goods and became part of

the basis of the bargain creating an express warranty that the goods shall conform to the affirmations of fact or promises.

310.    The foods ingested by Plaintiffs' babies and children did not conform to the representations made by Defendants, because these foods contained toxic levels of heavy metals and ingredients not safe for human ingestion in the manner intended by Defendants and contained ingredients not disclosed in the product labeling.

311.    Plaintiffs, by use of reasonable care, could not have discovered the breached warranty and realized the hidden increased risks and unreasonable dangers of allowing their children to ingest these foods.

312.    Plaintiffs did not know of the presence of these toxins until the release of the Report on February 4, 2021.

313.    As a direct or proximate result of Defendants' conduct, Plaintiffs and the punitive Class have suffered actual damages in the purchase of these baby foods that were worth significantly less than the price paid and because they would not have purchased the product had they known of the presence of heavy metals, entitling them to compensatory and equitable damages, attorneys' fees and costs and declaratory relief in an amount to be proven at trial.

314.    Further, Plaintiffs and the putative Class shall be entitled to an award of punitive damages, as is clear from the facts herein that Defendants' actions were performed with a realization of the imminence of danger and a reckless disregard and complete indifference to the probable consequences of their actions. By Defendants' putting their own pecuniary interests ahead of all else, they sacrificed the safety, health and wellbeing of innocent babies, toddlers, and children, and also unfairly profited off of unsuspecting parents and purchasers who believed they

were buying healthy food for their children. The only way to prevent this type of egregious indifference again is to assess punitive damages against Defendants.

## COUNT III: Breach of Implied Warranty
## v. All Defendants

315.     Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

316.     Plaintiff Johnson alleges this claim against Defendants Beech-Nut, Campbell, Gerber, Hain, and Nurture. Plaintiff Johnston alleges this claim against Defendants Beech-Nut, Gerber, and Walmart. Plaintiff Bucci alleges this claim against Defendants Nurture, Beech-Nut, Campbell, Gerber, and Hain. Plaintiff Gross alleges this claim against Defendants Campbell, Hain, Gerber, Nurture, and North Castle.  Plaintiff McCartin alleges this claim against Defendants Campbell, Gerber, Nurture, and Beech-Nut. Plaintiff Lake alleges this claim against Defendants Campbell, Gerber, Nurture, and Hain. Plaintiff Nemmers alleges this claim against Defendants Beech-Nut, Campbell, Nurture, Hain, and Gerber. Plaintiff Scott alleges this claim against Defendants Gerber, Nurture and Campbell. Plaintiff Tankard alleges this claim against Gerber and Nurture. Plaintiff VanDyke alleges this claim against Defendants Hain, Campbell, Nurture, and Gerber.

317.     At all relevant times, Defendants were merchants who dealt in goods of that kind, and in fact, boasted about their processes in production of safe and healthy baby food.

318.     The baby foods at issue were reasonably fit for the ordinary purposes for which such goods are used and did not meet the expectations for the performance of the product when used in the customary, usual, and reasonably foreseeable manner.  Nor were these products minimally safe for their expected purpose.

319.    Unbeknownst to them, at the time the Plaintiffs purchased these baby foods, the toxic high levels of heavy metals and other defects did exist.

320.    Plaintiffs did not know of the presence of these toxins until the release of the Report on February 4, 2021.

321.    The products at issue, even if they served their purpose in serving as food and sustenance for babies and children, cannot create a benefit of the bargain because the heavy metals, and their dangerous effects were never bargained for.

322.    Because of the presence of these heavy metals, these products do create a present economic injury to Plaintiffs and the putative class because their sale should never have occurred.

323.    As a direct or proximate result of Defendants' conduct, Plaintiffs and the putative Class have suffered actual damages in the purchase of these baby foods that were worth significantly less than the price paid and because they would not have purchased the product had they known of the presence of heavy metals, entitling them to compensatory and equitable damages, attorneys' fees and costs and declaratory relief in an amount to be proven at trial.

324.    Further, Plaintiffs and the putative Class shall be entitled to an award of punitive damages, as is clear from the facts herein that Defendants' actions were performed with a realization of the imminence of danger and a reckless disregard and complete indifference to the probable consequences of their actions. By Defendants' putting their own pecuniary interests ahead of all else, they sacrificed the safety, health and wellbeing of innocent babies, toddlers, and children, and also unfairly profited off of unsuspecting parents and purchasers who believed they were buying healthy food for their children. The only way to prevent this type of egregious indifference again is to assess punitive damages against Defendants.

### COUNT IV: Negligent Inspection
### v. All Defendants

325.    Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

326.    Plaintiff Johnson alleges this claim against Defendants Beech-Nut, Campbell, Gerber, Hain, and Nurture. Plaintiff Johnston alleges this claim against Defendants Beech-Nut, Gerber, and Walmart. Plaintiff Bucci alleges this claim against Defendants Nurture, Beech-Nut, Campbell, Gerber, and Hain. Plaintiff Gross alleges this claim against Defendants Campbell, Hain, Gerber, Nurture, and North Castle.  Plaintiff McCartin alleges this claim against Defendants Campbell, Gerber, Nurture, and Beech-Nut. Plaintiff Lake alleges this claim against Defendants Campbell, Gerber, Nurture, and Hain. Plaintiff Nemmers alleges this claim against Defendants Beech-Nut, Campbell, Nurture, Hain, and Gerber. Plaintiff Scott alleges this claim against Defendants Gerber, Nurture and Campbell. Plaintiff Tankard alleges this claim against Gerber and Nurture. Plaintiff VanDyke alleges this claim against Defendants Hain, Campbell, Nurture, and Gerber.

327.    At all relevant times, Defendants were manufacturers of the baby food at issue and had a duty to make such tests and inspections, during and after the process of manufacture, to ensure these baby foods were safe for ingestion and devoid of toxic levels of heavy metals.

328.    Instead, Defendants failed to use reasonable care in making such tests and inspections, and instead, oftentimes only tested the ingredients of the baby food individually, never testing the finished product that was put on store shelves for purchase by the Plaintiffs and the putative Class.

329.    Further, Defendants failed to use reasonable care in making such tests and inspections by sometimes not even testing for heavy metals like mercury at all in their products and/or ingredients that were then sold to Plaintiffs and the putative Class.

330.   Had Defendants properly and effectively tested their finished products, the foods that would actually be consumed by babies as young as four months old, they would have been alerted to the fact that these products contained dangerously high levels of: arsenic, lead, cadmium or mercury.

331.   By failing to exercise this reasonable care, Defendants manufactured harmful and toxic baby foods.

332.   As a direct or proximate result of Defendants' conduct, Plaintiffs and the putative Class have suffered actual damages in the purchase of these baby foods that were worth significantly less than the price paid and because they would not have purchased the product had they known of the presence of heavy metals, entitling them to compensatory and equitable damages, attorneys' fees and costs and declaratory relief in an amount to be proven at trial.

333.   Further, Plaintiffs and the putative Class shall be entitled to an award of punitive damages, as is clear from the facts herein that Defendants' actions were performed with a realization of the imminence of danger and a reckless disregard and complete indifference to the probable consequences of their actions. By Defendants' putting their own pecuniary interests ahead of all else, they sacrificed the safety, health and wellbeing of innocent babies, toddlers, and children, and also unfairly profited off of unsuspecting parents and purchasers who believed they were buying healthy food for their children. The only way to prevent this type of egregious indifference again is to assess punitive damages against Defendants.

### COUNT V: Negligent Misrepresentation
### v. All Defendants

334.   Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

335.    Plaintiff Johnson alleges this claim against Defendants Beech-Nut, Campbell, Gerber, Hain, and Nurture. Plaintiff Johnston alleges this claim against Defendants Beech-Nut, Gerber, and Walmart. Plaintiff Bucci alleges this claim against Defendants Nurture, Beech-Nut, Campbell, Gerber, and Hain. Plaintiff Gross alleges this claim against Defendants Campbell, Hain, Gerber, Nurture, and North Castle.  Plaintiff McCartin alleges this claim against Defendants Campbell, Gerber, Nurture, and Beech-Nut. Plaintiff Lake alleges this claim against Defendants Campbell, Gerber, Nurture, and Hain. Plaintiff Nemmers alleges this claim against Defendants Beech-Nut, Campbell, Nurture, Hain, and Gerber. Plaintiff Scott alleges this claim against Defendants Gerber, Nurture and Campbell. Plaintiff Tankard alleges this claim against Gerber and Nurture. Plaintiff VanDyke alleges this claim against Defendants Hain, Campbell, Nurture, and Gerber.

336.    Because Plaintiffs' reasonably relied on Defendants as longstanding manufacturers of baby food and Defendants had a relationship vis-à-vis consumers seeking to purchase healthy foods for their children, Defendants had a duty to alert Plaintiffs about what was actually contained in their products.

337.    Defendants have known for years, as indicated by the Clean Label Report in 2017, the Consumer Report in 2018, the inception of the Baby Food Council in January 2019, and the Healthy Babies Bright Futures report in October 2019 that their products contained *inter alia* mercury, lead, cadmium and arsenic.

338.    When Defendants were unequivocally confronted with these facts, they had a duty to speak and inform Plaintiffs and members of the putative class.

339.    But instead, Defendants put their own profits over the health and safety of children, and actively withheld the fact that these containments were contained in the food, at high levels,

far exceeding that allowed in regular bottled water and omitted these ingredients and containments from the labels and packaging of these products.

340. Decisionmakers, executives, and every employee in the marketing and/or labeling departments of these Defendants had the choice to expose the containments to Plaintiffs and members of the putative class, and they all chose to ignore it.

341. Defendants grossed billions of dollars in revenue in the sale of these products, which would have been significantly diminished if Plaintiffs and members of the putative class had known about the toxins contained in the baby foods.

342. Plaintiffs' reliance on Defendants' representations that the baby food they produced was as advertised and labeled was reasonable, because consumers expect food producers, especially food made for vulnerable, developing babies and children, not to contain heavy metals at toxic levels.

343. As a direct or proximate result of Defendants' conduct, Plaintiffs and the putative Class have suffered actual damages in the purchase of these baby foods that were worth significantly less than the price paid and because they would not have purchased the product had they known of the presence of heavy metals, entitling them to compensatory and equitable damages, attorneys' fees and costs and declaratory relief in an amount to be proven at trial.

344. Further, Plaintiffs and the putative Class shall be entitled to an award of punitive damages, as is clear from the facts herein that Defendants' actions were performed with a realization of the imminence of danger and a reckless disregard and complete indifference to the probable consequences of their actions. By Defendants' putting their own pecuniary interests ahead of all else, they sacrificed the safety, health and wellbeing of innocent babies, toddlers, and children, and also unfairly profited off of unsuspecting parents and purchasers who believed they

were buying healthy food for their children. The only way to prevent this type of egregious indifference again is to assess punitive damages against Defendants.

**COUNT VI: Unjust enrichment**
**v. All Defendants**

345.    Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

346.    Plaintiff Johnson alleges this claim against Defendants Beech-Nut, Campbell, Gerber, Hain, and Nurture. Plaintiff Johnston alleges this claim against Defendants Beech-Nut, Gerber, and Walmart. Plaintiff Bucci alleges this claim against Defendants Nurture, Beech-Nut, Campbell, Gerber, and Hain. Plaintiff Gross alleges this claim against Defendants Campbell, Hain, Gerber, Nurture, and North Castle.  Plaintiff McCartin alleges this claim against Defendants Campbell, Gerber, Nurture, and Beech-Nut. Plaintiff Lake alleges this claim against Defendants Campbell, Gerber, Nurture, and Hain. Plaintiff Nemmers alleges this claim against Defendants Beech-Nut, Campbell, Nurture, Hain, and Gerber. Plaintiff Scott alleges this claim against Defendants Gerber, Nurture and Campbell. Plaintiff Tankard alleges this claim against Gerber and Nurture. Plaintiff VanDyke alleges this claim against Defendants Hain, Campbell, Nurture, and Gerber.

347.    Defendants here are the leading seven producers of baby foods in this country, in an extremely lucrative industry.

348.    Defendants received a benefit to the tune of tens of billions of dollars in purchases of this defective, dangerous baby food.

349.    Defendants retained these billions of dollars in revenue.

350. Under the circumstances and the fact that these Defendants did produce and sell baby foods to Plaintiffs and the putative Class which contained dangerous levels of toxic, heavy metals, it is unjust and unequitable for Defendants to retain the money paid for these baby foods.

351. As a direct or proximate result of Defendants' conduct, Plaintiffs and the putative Class have suffered actual damages in the purchase of these baby foods that were worth significantly less than the price paid and because they would not have purchased the product had they known of the presence of heavy metals, entitling them to compensatory and equitable damages, attorneys' fees and costs and declaratory relief in an amount to be proven at trial.

352. Further, Plaintiffs and the putative Class shall be entitled to an award of punitive damages, as is clear from the facts herein that Defendants' actions were performed with a realization of the imminence of danger and a reckless disregard and complete indifference to the probable consequences of their actions. By Defendants' putting their own pecuniary interests ahead of all else, they sacrificed the safety, health and wellbeing of innocent babies, toddlers, and children, and also unfairly profited off of unsuspecting parents and purchasers who believed they were buying healthy food for their children. The only way to prevent this type of egregious indifference again is to assess punitive damages against Defendants.

**COUNT VII: Violations of Kansas Consumer Protection Act,**
**Kan. Stat. Ann. § 50–623 et seq**
**v. All Defendants**

353. Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

354. Plaintiff Johnson alleges this claim against Defendants Beech-Nut, Campbell, Gerber, Hain, and Nurture. Plaintiff Bucci alleges this claim against Defendants Nurture, Beech-Nut, Campbell, Gerber, and Hain. Plaintiff Gross alleges this claim against Defendants Campbell,

Hain, Gerber, Nurture, and North Castle. Plaintiff Lake alleges this claim against Defendants Campbell, Gerber, Nurture, and Hain. Plaintiff Nemmers alleges this claim against Defendants Beech-Nut, Campbell, Nurture, Hain, and Gerber. Plaintiff Tankard alleges this claim against Gerber and Nurture. Plaintiff VanDyke alleges this claim against Defendants Hain, Campbell, Nurture, and Gerber.

355. Defendants purposefully availed themselves of the privilege of conducting activities within the forum State, by regularly and routinely selling their products across the State of Kansas, thus invoking the benefits and protections of its laws.

356. Defendants engaged in both deceptive and unconscionable acts and practices in the sale of the baby foods at issue, particularly:

    a. Labeling the baby food in a misleading manner as:

        i. Organic;

        ii. Safe;

        iii. Natural;

        iv. Healthy;

        v. Pure;

        vi. "Real food".

    b. Failing to include any mention of the dangerous levels of toxic heavy metals, particularly:

        i. Arsenic;

        ii. Cadmium;

        iii. Lead;

        iv. Mercury;

       v.   Other dangerous heavy metals and/or toxins.

    c.  Failing to test the final products that were placed for sale and purchase by unknowing Plaintiffs and the putative Class;

    d.  Placing baby foods for sale and purchase by unknowing Plaintiffs and the putative Class which contained levels of toxic heavy metals that far exceeded the allowed amount for other food and drinks, such as bottled water, without warning to consumers.

    e.  Claiming they had standards for their products and threshold levels for allowable heavy metals, but then placing baby foods for sale and purchase by unknowing Plaintiffs and the putative class which contained heavy metals in far excess of those levels.

    f.  For other reasons that will be revealed in the course of discovery.

357.   Defendants took advantage of the inability of Plaintiffs and the putative Class because of their ignorance to the presence of these toxins in the baby food they purchased.

358.   Plaintiffs and the putative Class reasonably relied on Defendants' representations that these foods were "safe" and "healthy", etc.

359.   Plaintiffs and the putative Class have certainly been aggrieved by Defendants' violations of the Kansas Consumer Protection Act, as they have allowed their babies and children to ingest this food which contained toxic levels of baby food and also because they spent money purchasing their dangerous foods.

360.   As a direct or proximate result of Defendants' conduct, Plaintiffs and the putative Class have suffered actual damages in the purchase of these baby foods that were worth significantly less than the price paid and because they would not have purchased the product had

they known of the presence of heavy metals, entitling them to compensatory and equitable damages, attorneys' fees and costs and declaratory relief in an amount to be proven at trial.

361.    Further, Plaintiffs and the putative Class shall be entitled to an award of punitive damages, as is clear from the facts herein that Defendants' actions were performed with a realization of the imminence of danger and a reckless disregard and complete indifference to the probable consequences of their actions. By Defendants' putting their own pecuniary interests ahead of all else, they sacrificed the safety, health and wellbeing of innocent babies, toddlers, and children, and also unfairly profited off of unsuspecting parents and purchasers who believed they were buying healthy food for their children. The only way to prevent this type of egregious indifference again is to assess punitive damages against Defendants.

## COUNT VIII: Medical Monitoring
## v. All Defendants

362.    Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

363.    Plaintiff Johnson alleges this claim against Defendants Beech-Nut, Campbell, Gerber, Hain, and Nurture. Plaintiff Johnston alleges this claim against Defendants Beech-Nut, Gerber, and Walmart. Plaintiff Bucci alleges this claim against Defendants Nurture, Beech-Nut, Campbell, Gerber, and Hain. Plaintiff Gross alleges this claim against Defendants Campbell, Hain, Gerber, Nurture, and North Castle.  Plaintiff McCartin alleges this claim against Defendants Campbell, Gerber, Nurture, and Beech-Nut. Plaintiff Lake alleges this claim against Defendants Campbell, Gerber, Nurture, and Hain. Plaintiff Nemmers alleges this claim against Defendants Beech-Nut, Campbell, Nurture, Hain, and Gerber. Plaintiff Scott alleges this claim against Defendants Gerber, Nurture and Campbell. Plaintiff Tankard alleges this claim against Gerber

and Nurture. Plaintiff VanDyke alleges this claim against Defendants Hain, Campbell, Nurture, and Gerber.

364.    Due to non-specific signs and symptoms of toxicity, as well as the fact that the duration and extent of exposure is often not known, diagnosis of most toxic element exposures depends on laboratory testing.

365.    According to scientists, laboratory testing is an important tool for detecting and managing exposure to toxic heavy metals like arsenic, cadmium, lead, and mercury.

366.    Several analytical methods are available.

367.    While the effects of lead poisoning are permanent, if caught early, there are things parents can do to prevent further exposure and reduce damage to their child's health.

368.    Most children with any lead in their blood have no obvious immediate symptoms. Blood tests are a simple and readily available way to assess a person's exposure to lead.

369.    According to the CDC, early identification of elevated blood lead levels is key to reducing the long-term effects of lead exposure.

370.    Testing provides parents and medical professionals with the necessary information to provide guidance on follow-up services.

371.    Medical monitoring is reasonably necessary to enable Plaintiffs and the Class to obtain diagnostic testing for their exposed children to allow early detection and treatment of latent injuries or disease that may have developed or will develop as a result of exposure to toxic heavy metals in Defendants' baby food products.

372.    Plaintiffs and the Class therefore seek an injunction and/or other equitable relief from this Court to create a Court-supervised, Defendant-funded, comprehensive medical

monitoring program for exposed children of class members and notification to all Class Members of the necessity and importance of medical monitoring.

## Count IX: Fraud by Omission
## v. All Defendants

373.    Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

374.    Plaintiff Johnson alleges this claim against Defendants Beech-Nut, Campbell, Gerber, Hain, and Nurture. Plaintiff Johnston alleges this claim against Defendants Beech-Nut, Gerber, and Walmart. Plaintiff Bucci alleges this claim against Defendants Nurture, Beech-Nut, Campbell, Gerber, and Hain. Plaintiff Gross alleges this claim against Defendants Campbell, Hain, Gerber, Nurture, and North Castle.  Plaintiff McCartin alleges this claim against Defendants Campbell, Gerber, Nurture, and Beech-Nut. Plaintiff Lake alleges this claim against Defendants Campbell, Gerber, Nurture, and Hain. Plaintiff Nemmers alleges this claim against Defendants Beech-Nut, Campbell, Nurture, Hain, and Gerber. Plaintiff Scott alleges this claim against Defendants Gerber, Nurture and Campbell. Plaintiff Tankard alleges this claim against Gerber and Nurture. Plaintiff VanDyke alleges this claim against Defendants Hain, Campbell, Nurture, and Gerber.

375.    Defendants have known for years, as indicated by the Clean Label Report in 2017, the Consumer Report in 2018, the inception of the Baby Food Council in January 2019, and the Healthy Babies Bright Futures report in October 2019 that their products contained *inter alia* mercury, lead, cadmium and arsenic.

376.    When Defendants were unequivocally confronted with these facts, they continued to falsely market their products as "healthy", "safe", "pure" and failed to exercise reasonable care

to inform Plaintiffs and members of the putative class of what was actually contained in the product.

377.    Plaintiffs and members of the putative class relied on Defendants' representations that the foods were safe for consumption by babies and children.

378.    Plaintiffs' reliance on Defendants' representations that the baby food they produced was as advertised and labeled was reasonable, because consumers expect food producers, especially food made for vulnerable, developing babies and children, not to contain heavy metals at toxic levels.

379.    Plaintiffs and members of the putative class, as consumers of baby food for their babies and children were the exact people for whose benefit and guidance the information was supplied.

380.    As a direct or proximate result of Defendants' conduct, Plaintiffs and the putative Class have suffered actual damages in the purchase of these baby foods that were worth significantly less than the price paid and because they would not have purchased the product had they known of the presence of heavy metals, entitling them to compensatory and equitable damages, attorneys' fees and costs and declaratory relief in an amount to be proven at trial.

381.    Further, Plaintiffs and the putative Class shall be entitled to an award of punitive damages, as is clear from the facts herein that Defendants' actions were performed with a realization of the imminence of danger and a reckless disregard and complete indifference to the probable consequences of their actions. By Defendants' putting their own pecuniary interests ahead of all else, they sacrificed the safety, health and wellbeing of innocent babies, toddlers, and children, and also unfairly profited off of unsuspecting parents and purchasers who believed they

were buying healthy food for their children. The only way to prevent this type of egregious indifference again is to assess punitive damages against Defendants.

## DEMAND FOR JURY TRIAL

Plaintiffs are entitled to and hereby demand a jury trial in this matter.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs respectfully requests that this Court will:

a.      Enter judgment against Defendants, jointly and severally, in such amounts as will fully and adequately compensate Plaintiffs for the damages they have suffered, in an amount to be determined at trial;

b.      Award Plaintiffs punitive damages against Defendants, jointly and severally, in an amount to be determined by the jury for Defendants' violations of federal and state law;

c.      Award Plaintiffs damages and treble damages under the RICO Act;

d.      Award Plaintiffs pre-judgment and post-judgment interest;

e.      Award Plaintiffs their actual expenses of litigation, including reasonable attorney's fees;

g.      Appoint Plaintiffs as class representatives;

h.      Appoint Plaintiffs' counsel as counsel for the class;

i.      Award Plaintiffs such other and further relief as the Court deems just and proper.

Respectfully submitted,

/s/ *Rex A. Sharp*

Rex A. Sharp,
Isaac Diel,
Ryan C. Hudson,
Sarah T. Bradshaw,
Ruth Anne French-Hodson
SHARP LAW, LLP
5301 W. 75th Street
Prairie Village, KS  66208
(913) 901-0505
(913) 901-0419 fax
rsharp@midwest-law.com
idiel@midwest-law.com
rhudson@midwest-law.com
sbradshaw@midwest-law.com
rafrenchhodson@midwest-law.com

## APPENDIX OF EXHIBITS

**Exhibit A:** Staff Report, Subcommittee on Economic and Consumer Policy of the Committee on Oversight and Reform, U.S. House of Representatives, *Baby Foods Are Tainted with Dangerous Levels of Arsenic, Lead, Cadmium, and Mercury* (February 4, 2021)

**Exhibit B:** Letter from the President and CEO of Beech-Nut Nutrition Company to Chairman Raja Krishnamoorthi, Subcommittee on Economic and Consumer Policy, Committee on Oversight and Reform (Dec. 6, 2019)

**Exhibit C:** Letter from Nurture, Inc. to Chairman Raja Krishnamoorthi, Subcommittee on Economic and Consumer Policy, Committee on Oversight and Reform (Dec. 18, 2019)

**Exhibit D:** Letter from Kelly B. Kramer, Counsel for The Hain Celestial Group, Inc. to Chairman Raja Krishnamoorthi, Subcommittee on Economic and Consumer Policy, Committee on Oversight and Reform (Dec. 11, 2019)

**Exhibit E:** Letter from the Chief Executive Officer of Gerber Products Company to Chairman Raja Krishnamoorthi, Subcommittee on Economic and Consumer Policy, Committee on Oversight and Reform (Dec. 19, 2019)

**Exhibit F:** Letter from Thomas J. Perrelli, Counsel for Campbell to Chairman Raja Krishnamoorthi, Subcommittee on Economic and Consumer Policy, Committee on Oversight and Reform (Dec. 11, 2019)

**Exhibit G**: Healthy Babies Bright Futures, *What's In My Baby's Food?,* Oct. 2019.

**Exhibit H:** Clean Label Project, *Baby Food: A Puree of Plasticizers and Heavy Metals*, Aug. 10. 2020.

**Exhibit I:** Department of Food Science, Cornell University. *The Baby Food Council*.

**Exhibit J:** Hain slideshow to FDA.